UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM DIVISION

In re:

STUART ROY MILLER,                                    Case No.: 20-22497-EPK

　　　　Debtor.                                         Chapter 11

_____/

### *EXPEDITED* MOTION TO REMOVE
### DEBTOR IN POSSESSION AND CONVERT CASE

**During a recent examination under oath, the debtor in possession stipulated to committing fraud on multiple occasions and invoked his Fifth Amendment privilege against self-incrimination.**

**A debtor in possession acts as the representative of the estate and carries attendant fiduciary duties to creditors.  His examination testimony make it clear that the debtor is not qualified to serve as a debtor in possession, and creditors risk substantial harm so long as the estate is not managed by capable fiduciary.**

**Through this motion, Office Depot requests that the debtor be removed as a debtor in possession and the case converted to chapter 7.  In light of the concerns raised *supra*, Office Depot respectfully requests that this matter be scheduled for hearing on an expedited basis, on or before the Court's March 3, 2021 motion calendar.**

Office Depot, Inc. ("Office Depot"), pursuant to 11 U.S.C. §§ 1112(b) and 1185(a), respectfully requests that the Court: (1) remove Stuart Roy Miller (the "Debtor") as a chapter 11 debtor in possession, and (2) convert the case to chapter 7.  In support of these requests Office Debtor states:

### BACKGROUND

1.　　　Stuart Roy Miller (the "Debtor") filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code on November 13, 2020.  ECF No. 1.

{1031/000/00517844}

2.      The case is a small business reorganization proceeding under subchapter V of chapter 11.  ECF No. 1 at p. 4.

### A.      The Office Depot Claim.

3.      Office Depot is a nationwide retail office supplier and creditor of the Debtor.

4.      In early 2020, the Debtor, two separate individuals, Richard Falcha and Jeffrey Bishop, and an entity under their control, JRS Health Services, LLC ("JRS") (together, the "JRS Defendants"), sought to take advantage in the spike in demand for personal protective equipment ("PPE") brought about by the Covid-19 pandemic.  During the early phase of the pandemic, worldwide demand for PPE spiked.  Sensing an opportunity to profit via fraud, the Debtor, Mr. Falcha and Mr. Bishop formed JRS in April 2020.

5.      The Debtor then misrepresented to Office Depot, which supplies frontline individuals with desperately needed PPE, that JRS was a licensed medical exporter from Asia. The Debtor further misrepresented that JRS had warehouses throughout Asia and the United States, and could supply 20,000,000 to 50,000,000 boxes of examination gloves every 30 to 45 days.  Based on these representations, in July 2020 Office Depot purchased 300,000 boxes of the gloves from JRS for $2.751 million.

6.      After repeated, unexplained delays, in September 2020 JRS delivered exactly one sample box of expired gloves.  Office Depot and JRS accordingly arranged for a second sample of gloves to be shipped.  Upon receiving the shipment, however, Office Depot was able to determine that the gloves did not originate from an overseas factory, but rather a residential condominium.

7.      Upon reaching out to the Asian manufacturer of the gloves directly, Office Depot was informed that it did not export any gloves to the United States at all.  Put otherwise, it became apparent that the JRS were engaged in a massive fraud relating to the sale of PPE.

{1031/000/00517844}

8.      Nor did the fraud end with an initial purchase of gloves.  Prior to learning that the JRS business was a complete sham, Office Depot placed additional orders for gloves.  In all, Office Depot paid not less than $11,875,000.00 to JRS as a result of the scheme.  Despite this windfall, however, the Debtor's schedules disclose only $6,163.34 in cash.  *See* ECF No. 58 at p. 5 (amended schedules).

9.      Office Depot has sued all of the JRS Defendants except the Debtor in Florida state court, and has timely filed a proof of claim in this bankruptcy case.  *See generally* Proof of Claim No. 11.

**B.    The HCH Claim.**

10.      Hill Country Hillside, Ltd. ("HCH") is also a creditor of the Debtor.  HCH sued the Debtor and several affiliates in Texas state court in 2017.  In the suit HCH alleged that the defendants purported to market a joint venture to sign up healthcare patients for annual preventive examinations that would be paid by Medicare.  Compl. ¶ 42.[1]  The defendants solicited investments from victims, including HCH, for the venture.  *Id.* at ¶ 43.

11.      In reality, however, the defendants did little or no work to market the venture.  They simply pocketed the investments while making a number of misrepresentations to further the scheme.  *See* Compl. ¶¶ 44–48.  Without limitation, the Debtor represented that an entity he controlled had entered into contracts with St. Francis Healthcare Systems and Meridian Health Systems. Compl. ¶ 49.  The Debtor further represented that the contracts were signed by third-party medical professionals, Dr. Ron Kimmel and Dr. Navneet Kathuria, respectively.  *Id.* However, those contracts did not actually exist—they were forged.  *Id.*  The Debtor repeated this conduct with a separate entity, Denials Recovery Group, Inc. ("DRG"), misrepresenting to

---

[1]      "Compl." refers to the state court complaint filed by HCH.  The complaint is attached as an exhibit to Proof of Claim No. 8.

investors that it had entered into a contract with Diagnostic Clinic Medical Group ("DCMG").  *Id.* at ¶ 50.  The Debtor alleged that the contract was executed by the president of DCMG and used it to procure $500,000 or more in investments.  *Id.*  That contract too was a forgery.  *Id.*

12.    In light of this misconduct, which gave rise to numerous causes of action under Texas law, HCH obtained a consent judgment against the Debtor in an amount exceeding $2.4 million.  *See generally* Proof of Claim No. 8.

**C.    The Rule 2004 Examination.**

13.    Several interested parties in this bankruptcy case, including HCH and Office Depot, began a Fed. R. Bankr. 2004 examination of the Debtor on January 29, 2021.  A transcript of the afternoon portion of the examination is attached as **EXHIBIT "A"**.[2]

14.    At the examination, the Debtor expressly stipulated to having committed fraud in connection with the conduct alleged in the HCH lawsuit.  For example, the Debtor testified in response to questions by counsel for HCH:

> Q:    All right.  You had testified earlier today in—in what I think is probably for you a difficult thing to acknowledge and that is that you forged the D.M.C.G. or D.C.M.G. contract.  Is that right?
>
> A:    That is.
>
> Q:    Okay.  And you forged that contract in—in connection with an investment that my client, Mr. Kastleman, through his entities, made to D.R.G.  Right?
>
> A:    That is correct.
>
> Q:    And you knew at that time that you did that, that that was a—that was just not right?  I mean, that's—you realize—you recognized that that was a bad thing to do?
>
> A:    Yes.

---

[2]    For the avoidance of doubt, the examination is ongoing and has not been concluded.

> Q:    Okay.  And you did it anyway?
>
> A:    Yes.
>
> Q:    Okay.  And it wasn't the first or the last time that you had done it.  Correct?
>
> A:    Yes.

Jan. 29, 2021 Examination Tr., p. 6, l. 21–p. 7, l. 15.  The Debtor added:

> Q:    Okay.  And in addition to forging the instruments and inducing my clients to provide your companies money as a result of forging those instruments, you maintained for a long time that—that you had not forged the instruments and that those agreements indeed were real, legitimate contracts.  Correct?
>
> A:    Yes.

*Id.* at p. 9, ll. 8–15.

15.    Following these revelations the Debtor elected to invoke his Fifth Amendment privilege against self-incrimination in response to additional questions by HCH:

> Q:    Okay.  And in addition to forging the contracts—I say four, you think it was three—you also manipulated or falsified e-mails that you claim came from these health-care providers that you falsely claimed you had contracts with to make it look like you actually had contracts.  Correct?
>
> A:    I'm going to take the Fifth.
>
> Q:    And the point of manipulating or falsifying those e-mails was to further induce my clients to continue in this relationship, this business relationship with you and your companies.  Correct?
>
> A:    I'm going to take the Fifth on that.
>
> Q:    All right.  And you manipulated or falsified those e-mails and submitted them to my clients in order to make their investment look as if it was supported by legitimate contracts?
>
> A:    I'm going to take the Fifth on that.
>
> Q:    Okay.  Is it your intent to take the Fifth on questions that are associated with the contracts that you admitted you forged?

A:      Yes.

*Id.* at p.11, l. 8–p. 12, l. 3.

16.      The foregoing testimony is stunning.  The vast majority of individuals engaged in fraud do not stipulate to it—that is precisely the reason why other *indicia* of fraudulent behavior are used in legal analysis.  *See generally* Fla. Stat. § 726.105(2) (badges of fraud).  Here, however, the Debtor openly admitted to violating any number of civil and criminal statutes by forging contracts in order to solicit investments, before belatedly asserting his Fifth Amendment privileges.

17.      The Debtor cannot continue to act as the fiduciary and representative of the bankruptcy estate.  The Court should remove the debtor as a debtor in possession and convert the case to chapter 7.

## ARGUMENT

### A.      The Court Should Remove the Debtor as a Debtor in Possession.

Subchapter V of chapter 11 of the Bankruptcy Code became effective in 2020.  The subchapter contains various new provisions affecting debtors who elect to proceed under it, while rendering certain other provisions of the Bankruptcy Code inapplicable.  *See generally* 11 U.S.C. § 1181.

In a traditional chapter 11 case, the Court may appoint a trustee for cause, including fraud or dishonesty on the part of the debtor under § 1104(a)(1), and that appointment negates the debtor's status as a debtor in possession under § 1101.  *See* 11 U.S.C. §§ 1101(1) (defining "debtor in possession") and 1104(a) (procedures for appointment of trustee).  However, §§ 1101(1) and 1104 do not apply in subchapter V.  11 U.S.C. § 1181(1).  The subchapter instead includes a similar provision for the removal of a debtor in possession:

On request of a party in interest, and after notice and a hearing, the

court <u>shall</u> order that the debtor shall not be a debtor in possession for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor, either before or after the date of commencement of the case, or for failure to perform the obligations of the debtor under a plan confirmed under this subchapter.

11 U.S.C. § 1185(a) (emphasis supplied).

Assuming *arguendo* the test for removing a debtor in possession under § 1185(a) is substantially identical for appointing a trustee under § 1104(a)(1), the test is satisfied in this instance.  Section 1104(a)(1) mandates the appointment of a trustee "for cause, including fraud, dishonesty [or] incompetence…"  11 U.S.C. § 1104(a)(1).  In evaluating misconduct under § 1104(a)(1) courts have considered factors including:

- Materiality of the misconduct;

- Evenhandedness of lack of same in dealings with insiders or affiliated entities vis-à-vis other creditors or customers;

- The existence of prepetition voidable preferences or fraudulent transfers;

- Unwillingness or inability of management to pursue estate causes of action;

- Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor;

- Self-dealing by management or waste or squandering of corporate assets.

*In re SunCruz Casinos, LLC*, 298 B.R. 821, 830 (Bankr. S.D. Fla. 2003) (citation omitted).  Once a court finds that cause exists, "there is no discretion; an independent trustee must be appointed." *Id.* at 828–29.

The materiality and undisputed nature of the Debtor's misconduct warrants his removal as a debtor in possession.  The Debtor openly testified that he forged contracts in an effort to attract investments from HCH.  The Debtor stated that he knew forging the contracts was wrong at the time but did so anyway.  The Debtor added that, following the forgeries, he falsely maintained the

contracts were valid.  Finally, in this civil bankruptcy case, the Court may draw negative inferences from questions to which the Debtor asserted his Fifth Amendment privileges, such as whether he forged the contracts to induce third-party clients to continue in a false business relationship.  *See, e.g.*, *In re Santaella*, 298 B.R. 793, 812–13 (Bankr. S.D. Fla. 2002) (citing cases on Fifth Amendment inferences in the civil context).

This is not a gray area in which reasonable minds can differ on whether a prepetition act is dishonest or not.  The Debtor owes HCH over $2.4 million as a result of a fraudulent scheme.  The Debtor has admitted, without reservation and under oath, to forging contracts in furtherance of the scheme.  The Debtor has also asserted his Fifth Amendment privilege in response to follow up questions, and those questions are subject to a negative inference as a result.  There is no dispute that the Debtor exhibited fraud prepetition, and that Office Depot has satisfied its burden under § 1185.  The Court should remove the Debtor as a debtor in possession.

### B.    The Court Should Convert the Case.

Section 1112 of the Bankruptcy Code, which applies in subchapter V, permits the Court to convert a chapter 11 case to chapter 7 for "cause" upon the request of a party in interest.  *See* 11 U.S.C. § 1112(b).  In addition to removing the Debtor as a debtor in possession, Office Depot respectfully requests that the Court convert this case to chapter 7 for two primary reasons.

First, a § 1104(a)(1) showing of the fraud, dishonesty, incompetence or gross mismanagement may be used to support conversion or dismissal of a chapter 11 case.  *See In re Jayo*, 2006 WL 2433451, at *8 (Bankr. D. Idaho 2006) ("This crime [committed by the debtor] has components of fraud and dishonesty…Debtor acknowledges the elements of the crime as including knowing disposition and conversion and acknowledges that she acted with the intent to defraud.  Such fraud and dishonesty falls within the express language of § 1104(a)(1) and, the

Court above has found, it is not excluded from consideration under § 1112(b)(1) and (4). There is cause to convert the case to chapter 7."). For the reasons stated *supra* the Debtor has committed material, undisputed fraud, and that alone constitutes grounds for conversion here. This is particularly so given the similarity of this fact pattern to the *Jayo* case cited *supra*, in which both debtors likely committed crimes.

Second, upon the removal of a subchapter V debtor as the debtor in possession, the subchapter V trustee assumes the management of the debtor. *See* 11 U.S.C. § 1183(b)(5). However, this is an individual chapter 11 case. The estate does not hold greater value as a going concern and there is no business to reorganize. An active creditor body will likely object to the chapter 11 plan proposes by the Debtor. Given these dynamics, Office Depot believes the case where better serve the interests of creditors in a liquidation, with a chapter 7 trustee acting as the estate fiduciary and representative.

**WHEREFORE**, Office Depot respectfully requests that this Court enter an order: (1) removing the debtor as the debtor in possession, (2) converting the case to chapter 7, and (3) providing for such further relief as the Court deems just and proper.

Dated February 23, 2021

<div style="margin-left:40%">

SHRAIBERG, LANDAU & PAGE, P.A.
Attorneys for Office Depot
2385 NW Executive Center Drive, Suite 300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
Email: bss@slp.law
Email: pdorsey@slp.law

By:    */s/ Bradley Shraiberg*
        Bradley Shraiberg, Esq.
        Fla. Bar. No. 121622
        Patrick Dorsey, Esq.
        Fla. Bar. No. 0085841

</div>

## **ATTORNEY CERTIFICATION**

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court

for the Southern District of Florida and I am in compliance with the additional qualifications to

practice in this Court set forth in Local Rule 2090-1(A).

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via

CM/ECF Notice of Electronic Filing to all parties registered to receive electronic noticing in this

case on February 23, 2021.

By:  _/s/ Bradley Shraiberg_____
　　　　　　Bradley Shraiberg, Esq.

# EXHIBIT A

{1031/000/00517844}

STUART ROY MILLER Volume I                                    January 29, 2021
IN RE: STUART ROY MILLER                                                  1–4

## Page 1

```
 1        IN THE UNITED STATES BANKRUPTCY COURT
               SOUTHERN DISTRICT OF FLORIDA
 2            WEST PALM BEACH DIVISION
                Case No. 20-22497-EPK
 3
 4   IN RE:
 5   STUART ROY MILLER,
 6               Debtor.
 7   _____/
 8
 9        VIDEO TELECONFERENCING OF RULE 2004
10            EXAMINATION DUCES TECUM OF
11                STUART ROY MILLER
12             VOLUME I, PAGES 1 - 82
13
14   TAKEN ON BEHALF OF ALL INTERESTED PARTIES
15            Friday, January 29, 2021
                1:30 p.m. - 4:00 p.m.
16
17
18              Witness Location:
                Boca Raton, Florida 33487
19              Job #J6498924
20
21
22
23
24        Reported by:  Dona J. Wong, CSR, RPR
25
```

## Page 2

```
 1            APPEARANCES OF COUNSEL
 2     On behalf of Chad S. Paiva, the Trustee in Bankruptcy
     for Denials Recovery Group, Inc. via video
 3   teleconferencing:
 4
 5         FENDER, BOLLING AND PAIVA, P.A.
           P.O. Box 1545
 6         Fort Lauderdale, Florida 33302-1545
           Office: 407-810-2458
 7         Fax: 561-653-3937
           E-mail:  steven.fender@fender-law.com
 8         By:  G. STEVEN FENDER, ATTORNEY AT LAW
 9     On behalf of Creditor Office Depot via video
10   teleconferencing:
11         SHRAIBERG, LANDAU & PAGE, P.A.
           2385 NW Executive Center Drive
12         Suite 300
           Boca Raton, Florida 33431-8530
13         Office: 561-443-0800
           Fax: 561-998-0047
14         E-mail:  bss@slp.law
           By:  BRADLEY SHRAIBERG, ATTORNEY AT LAW
15
16     On behalf of Bryan Kastleman and Kastleman related
     parties via video teleconferencing:
17
18         THOMAS WILLIAMS MCCONNELL, PLLC
           14 West 7th Street
19         1100 Norwood Tower
           Austin, Texas 78701-3000
20         Telephone: 512-495-1471
           E-mail:  info@twmattorneys.com
21         By:  WALTER V. WILLIAMS, ATTORNEY AT LAW
22
23
24
25
```

## Page 3

```
 1        CONTINUED APPEARANCES OF COUNSEL
 2     On behalf of the Debtor via video teleconferencing:
 3         FURR AND COHEN P.A.
           2255 Glades Road
 4         Suite 301E
           Boca Raton, Florida  33431-7383
 5         Office: 561-395-0500
           Cell: 561-395-0500
 6         Fax: 561-338-7532
           E-mail:  rfurr@furrcohen.com
 7         By:  ROBERT C. FURR, ATTORNEY AT LAW
 8
       On behalf of the Trustee video teleconferencing:
 9
           KIEM LAW, PLLC
10         8461 Lake Worth Road
           Suite 114
11         Lake Worth, Florida  33467-2474
           Office: 561-600-0406
12         Fax: 561-763-7355
           E-mail:  tarek@kiemlaw.com
13         By:  TAREK KIRK KIEM, C.P.A. and ATTORNEY
                AT LAW
14
15   ALSO PRESENT VIA VIDEO TELECONFERENCING:
16         NEXTELIGENT HOLDINGS, INC.
           45 Rockefeller Plaza
17         Floor 21
           New York, NY 10111
18         Office:  860-356-4837
           E-mail:  lsanzaro@nexteligent.com
19         By:  PAUL CRISTIANO, VICE-PRESIDENT AND
                C.E.O.; RAYMOND POMANTE, PRESIDENT AND
20              C.O.O.; LOUIS SANZARO, CONSULTANT,
                BRYAN KASTLEMAN
21
           FRED WOOD, KIM FREEDMAN, OFFICE DEPOT
22         DENISSE CEDERNO/REPORTER
           ALICIA TRINLEY
23
24                  -  -  -
25
```

## Page 4

```
 1   REPORTER'S KEY TO PUNCTUATION
 2   -- at the end of the question, answer or colloquy
     indicates interruption by another speaker
 3
     . . . indicates while reading, words left out
 4
     . . . . and the end of a line indicates a trailing off
 5
     "Uh-huh" indicates affirmative
 6
     "Huh-uh" or "huh-huh" indicates negative
 7
 8                  -  -  -
 9                I N D E X
10                  -  -  -
11
12   WITNESS:        DIRECT   CROSS   REDIRECT   RECROSS
13
     STUART ROY MILLER
14
     BY MR. WILLIAMS      5
15   BY MR. SHRAIBERG              46
16                  -  -  -
17        N O  E X H I B I T S  M A R K E D
18                  -  -  -
19
20
21
22
23
24
25
```

STUART ROY MILLER Volume I
IN RE: STUART ROY MILLER

January 29, 2021

5–8

Page 5

1    VIDEO TELECONFERENCING 2004 EXAMINATION DUCES

2        TECUM OF STUART ROY MILLER,

3        Friday, January 29, 2021

4            - - -

5    Video teleconferencing 2004 Examination Duces Tecum

6    taken before Dona J. Wong, Certified Shorthand Reporter,

7    Registered Professional Reporter, and Notary Public in

8    and for the State of Florida at Large, in the above

9    cause.

10            - - -

11        THE COURT REPORTER:  Raise your right hand,

12    please.

13        (Oath administered.)

14        THE WITNESS:  I do.

15        THE COURT REPORTER:  Thank you.

16    Thereupon,

17            (STUART ROY MILLER)

18    having been first duly sworn or affirmed, was examined

19    and testified as follows:

20            DIRECT EXAMINATION

21    BY MR. WILLIAMS:

22    Q.   This is Walter Williams.  I guess I'll start,

23    if that's okay.

24        Mr. Miller, good afternoon.

25    A.   Good afternoon.

Page 6

1    Q.   Can you hear me just fine?

2    A.   At the moment, yes.

3    Q.   Okay, good.  You and I have been through this

4    dance a couple of times at this point on -- is that

5    right?

6    A.   Numerous, yes.

7    Q.   And you understand the ground rules with

8    respect to testimony under oath, do you not?

9    A.   I do.

10    Q.   All right.  Just a few more ground rules.  As

11    you know, I kind of start and stop and then start again.

12    I answer questions sometimes and so I would ask that you

13    just wait a beat before you answer my questions.

14    A.   Sounds fair.

15    Q.   Okay.  And if you need a break or, you know,

16    some other reason you need to kind of just get away from

17    seeing my smiling face on your computer screen, let me

18    know, and we'll do that as long as there's not a

19    question pending.  Okay?

20    A.   Sure.

21    Q.   All right.  You had testified earlier today

22    in -- in what I think is probably for you a difficult

23    thing to acknowledge and that is that you forged the

24    D.M.C.G. or D.C.M.G. contract.  Is that right?

25    A.   That is.

Page 7

1    Q.   Okay.  And you forged that contract in -- in

2    connection with an investment that my client,

3    Mr. Kastleman, through his entities, made with D.R.G.

4    Right?

5    A.   That is correct.

6    Q.   And you knew at the time that you did that,

7    that that was a -- that was just not right?  I mean,

8    that's -- you realize -- you recognized that that was a

9    bad thing to do?

10    A.   Yes.

11    Q.   Okay.  But you did it anyway?

12    A.   Yes.

13    Q.   Okay.  And it wasn't the first or the last

14    time that you had done it.  Correct?

15    A.   Yes.

16    Q.   And, in fact, you had forged --

17        MR. SHRAIBERG:  I apologize.  I just want to

18    clarify that "it" mean -- meant forged a document?

19        MR. WILLIAMS:  Correct.

20    BY MR. WILLIAMS:

21    Q.   Mr. Miller, in connection with your

22    professional relationship -- and by "you," I mean you or

23    your companies' -- professional relationship with my

24    clients -- and I'll just call them the Kastleman

25    entities -- you forged a total of four contracts and

Page 8

1    represented each of those contracts to be real and

2    valuable contracts to -- in order to induce my clients

3    to give your companies money.  Correct?

4    A.   It was a total of three contracts and, yes,

5    that is correct.

6    Q.   Okay.  And then on top of that, there was

7    another contract involving the JG Family Trust and John

8    Gilmore (phonetic).  Right?

9    A.   No, there were a total of three including

10    that, to the best of my knowledge.

11    Q.   Okay.  In the state court litigation in

12    Austin, most recently we sent a set of Requests for

13    Admissions and I -- and they were very detailed, and I

14    referenced four separate contracts.

15        Do you remember those Requests for Admissions?

16    A.   I don't.  I know what you're talking about.  I

17    don't remember them in detail.

18    Q.   Okay.  But you're -- you're not -- you

19    wouldn't -- you're not going to change your answers to

20    those Requests for Admissions if we -- and we went

21    through those in a lot of detail with the Court and

22    otherwise.  Right?

23    A.   That is correct.

24    Q.   Okay.  So they're -- you -- you haven't made

25    any mistakes in answering those Requests for Admissions

Page 9

1  that you recall today?
2      A.  Not that I recall today.
3      Q.  Okay.  And the amount of money that you
4  received from my clients and -- and the JG Family Trust
5  was $700,000 or -- or more in connection with those
6  forged instruments.  Correct?
7      A.  That is correct.
8      Q.  Okay.  And in addition to forging the
9  instruments and inducing my clients to provide your
10  companies money as a result of forging those
11  instruments, you maintained for a long time that -- that
12  you had not forged the instruments and that those
13  agreements indeed were real, legitimate contracts.
14  Correct?
15      A.  Yes.
16      Q.  Okay.  And in e-mails and through your
17  counsel, you represented that all of those contracts
18  were indeed real, legitimate contracts.  Correct?
19      A.  Yes.
20      Q.  And I took your deposition in Florida after a
21  lawsuit had been filed and asked you about -- about
22  those contracts, and you under oath said, No, they are
23  legitimate real contracts when I asked if you had forged
24  any of them.  Correct?
25      MR. FURR:  Let me -- let me -- I want to stop

Page 10

1  the deposition at this point.  I want to talk to
2  him privately so give me a second, Walter.  Okay?
3  Stuart, go on mute.  I'm going to call you.
4      MR. SHRAIBERG:  Robert, if you hear us, you're
5  not on mute.
6      MR. FURR:  I was down the hallway anyway.
7      MR. SHRAIBERG:  Okay.  Yeah, we don't really
8  hear what you were saying but I just wanted --
9      MR. FURR:  Yeah.
10      MR. WILLIAMS:  I can't remember what my last
11  question was.
12      THE COURT REPORTER:  Hold on.
13      (Whereupon, the record was read by the
14  reporter as follows:
15      "QUESTION:  I took your deposition in
16  Florida after a lawsuit had been filed and asked
17  you about -- about those contracts and you under
18  oath said no, they are legitimate real contracts
19  when I asked if you had forged any of them.
20  Correct?")
21  BY MR. WILLIAMS:
22      Q.  So, Mr. Miller, in response to that question,
23  what is your answer?
24      A.  I want to take the Fifth.
25      Q.  Okay.  And you're -- your concern in taking

Page 11

1  the Fifth is that you may incriminate yourself in some
2  way if you respond to that question?
3      MR. FURR:  He's taking the Fifth on that one
4  too.
5      THE WITNESS:  I'm going to take the Fifth on
6  that.
7  BY MR. WILLIAMS:
8      Q.  Okay.  And in addition to forging the
9  contracts -- I say four, you think it was three -- you
10  also manipulated or falsified e-mails that you claim
11  came from those health-care providers that you falsely
12  claimed you had contracts with to make it look like you
13  actually had contracts.  Correct?
14      A.  I'm going to take the Fifth.
15      Q.  And the point of manipulating or falsifying
16  those e-mails was to further induce my clients to
17  continue in this relationship, this business
18  relationship with you and your companies.  Correct?
19      A.  I'm going to take the Fifth on that.
20      Q.  All right.  And you manipulated or falsified
21  those e-mails and submitted them to my clients in order
22  to make their investment look as if it was supported by
23  legitimate contracts?
24      A.  I'm going to take the Fifth on that.
25      Q.  Okay.  Is it your intent to take the Fifth on

Page 12

1  questions that are associated with the contracts that
2  you had admitted you forged?
3      A.  Yes.
4      MR. FURR:  Yes, it is his intent to do that.
5  We don't dispute the liabilities of your client,
6  Mr. Williams.  We don't dispute it is not
7  dischargeable in bankruptcy.
8      MR. WILLIAMS:  I'm sorry, say that again.
9      MR. FURR:  I said we don't dispute that it's
10  not dischargeable in bankruptcy, his obligations to
11  Mr. Kastleman.
12      MR. WILLIAMS:  Okay.  I think, though, there
13  is some dispute about the Final Consent Judgment
14  and just the -- the dollars that are involved.  Is
15  that correct?
16      MR. FURR:  I don't know about that.  We can
17  probably agree upon an amount of money per your
18  claim, though.  We can't do it right now but I --
19      MR. WILLIAMS:  Right.  I'm just -- I'm trying
20  to calculate how much time and effort I want to put
21  into this given the Fifth Amendment and your
22  statement just now.
23      MR. FURR:  Right.
24  BY MR. WILLIAMS:
25      Q.  Mr. Miller, you had testified -- I'm going to



STUART ROY MILLER Volume I
IN RE: STUART ROY MILLER

January 29, 2021
13–16

Page 13

1  try to move on.  Maybe -- maybe these are questions
2  you're willing to answer.
3        When the lawsuit was filed in Texas, there was
4  a -- first on your part a resistance to submitting to
5  the jurisdiction of Travis County in Texas.
6        Do you recall that?
7    A.  I do.
8    Q.  And there was a long hearing and, ultimately,
9  the Court ruled in my clients' favor.  Correct?
10   A.  Yes.
11   Q.  Okay.  And then there were a series of
12  meetings and other efforts to try and resolve things,
13  and those were ultimately unsuccessful and that resulted
14  in my clients filing an application for temporary
15  injunction.  Do you recall that?
16   A.  I do.
17   Q.  And then prior to that hearing, prior to a
18  hearing on the temporary injunction, your attorney and
19  you agreed to the terms of a temporary injunction.
20  Correct?
21   A.  Correct.
22   Q.  And you were represented by counsel and D.R.G.
23  was represented by counsel?
24   A.  Correct.
25   Q.  Okay.  And, in fact, D.R.G. and you

Page 14

1  individually were represented by counsel throughout all
2  the litigation that happened in Travis County, and that
3  ultimately resulted in the Settlement Agreement
4  including the Final Consent Judgment.  Correct?
5    A.  That is correct.
6    Q.  And so when you testified earlier that
7  Mr. Kastleman kind of took over the -- the financial and
8  banking circumstances of D.R.G., that was pursuant to an
9  agreed temporary injunction that you agreed to with
10  counsel present who signed off on it?
11   A.  Yes, and I stated that earlier.
12   Q.  Right.  And part of that temporary injunction
13  said that Mr. Kastleman had exclusive control over the
14  funds and the bank accounts for D.R.G. and that your job
15  was exclusively to sell D.R.G. services and operate
16  its -- its -- operate it day to day.  Correct?
17   A.  That is correct.
18   Q.  Okay.  And in spite of that agreement and the
19  Court Order saying that very thing, you were able to get
20  money that belonged to D.R.G. and take it and put it in
21  a separate account and use it?
22   A.  Yes, that was the case.
23   Q.  Right.  And that's money that you had no right
24  to at that point in time, that you didn't ask anybody
25  for at that point in time, that you just took it on

Page 15

1  yourself to -- to do because you were desperate?
2    A.  Yes.  I was not being paid for my services.  I
3  took that money, but I also then gave both of your
4  clients equal, if not more, of that same amount of money
5  that came in, if you recall.
6    Q.  So -- so you took it but you gave it back?
7    A.  Yes.
8    Q.  And did you give it back before or after
9  somebody asked about it?
10   A.  After.
11   Q.  And right before the temporary injunction was
12  entered, D.R.G. entered into a series of hard money
13  loans.  Right?
14   A.  It was long before that, not right before.
15   Q.  Okay.  We can -- I'm looking at May 22, 2018;
16  June 13, 2018; and July 3rd, 2018.
17        Does that all sound about right for some of
18  those hard money loans?
19   A.  For some of those, yes.  There were previous
20  one as well.
21   Q.  All right.  And do you recall when the
22  temporary injunction was entered into?
23   A.  I believe -- no.  I -- I want to say April --
24   Q.  All right.
25   A.  No.  I think it was April.

Page 16

1    Q.  Okay.  Of 2018?
2    A.  I believe so.
3    Q.  Okay.
4    A.  Walter, when were those hard money loans
5  entered into, what was the date?
6    Q.  I have here May, June and July of 2018.
7    A.  Okay.
8    Q.  All right.  And in each of those hard money
9  loans, D.R.G. put up its -- its assets effectively as
10  collateral.  Right?
11   A.  Yes.
12   Q.  Okay.  And so three or more lenders all had
13  D.R.G.'s assets securing the loans.  Correct?
14   A.  Yes.
15   Q.  Okay.  Do you see anything wrong with that?
16   A.  I'm not sure what your question is.  Do I see
17  anything wrong with what?
18   Q.  Collateralizing D.R.G.'s assets three separate
19  times within 45 days.
20   A.  No.  Based on the money that was taken, no.
21   Q.  All right.  There was a meeting in Austin as
22  we were trying to get the first Austin or the first case
23  settled, and it was in my conference room, and you were
24  there with your lawyer, Bill Hopkins, and I was there,
25  Mr. Kastleman was there, John Gilmore was there and



STUART ROY MILLER Volume I
IN RE: STUART ROY MILLER

January 29, 2021
17—20

Page 17

1  Carol Ware (phonetic) was there.
2      Do you remember that meeting?
3      A.  There were several meetings like that so which
4  date are you referring to?
5      Q.  I'm referring to the first time that we did
6  that. I don't know the exact date.
7      A.  Okay. Yes.
8      Q.  And in that meeting, it is -- that's -- that's
9  the very first time that you admitted to forging those
10  contracts. Right?
11      A.  I'm going to take the Fifth on that.
12      Q.  Okay.
13      MR. FURR:  Hello, I'm going to have to call
14      you back. I'm on a conference call. Yeah, I'll
15      call you back. Bye-bye.
16  BY MR. WILLIAMS:
17      Q.  So there was a Settlement Agreement that was
18  highly negotiated with your counsel.
19      Do you recall that effort?
20      A.  I do.
21      Q.  And there are multiple aspects of that
22  Settlement Agreement -- or strike that.
23      There were multiple parts of that Settlement
24  Agreement that had some ongoing requirements on your
25  part to -- to report to my client your -- your assets

Page 18

1  and liabilities, et cetera.
2      Do you recall that requirement?
3      A.  I do.
4      Q.  And you -- you failed to meet that requirement
5  on multiple occasions. Is that correct?
6      A.  I do not agree with that.
7      Q.  Okay. So you -- you think that you supplied
8  all the financial statements that you were required to
9  under the Settlement Agreement?
10      A.  Up until very recently, yes.
11      Q.  Well, before your bankruptcy, maybe in the
12  summer of 2020. Correct?
13      A.  It was when the second -- it was after the
14  second lawsuit started so it might have been August,
15  September, somewhere around there; august, September,
16  October, somewhere around those dates.
17      Q.  When did you file bankruptcy?
18      A.  November.
19      Q.  You have some complaint about the terms of the
20  Settlement Agreement. Correct?
21      A.  I have more than some complaints, yes.
22      Q.  Well, let's not go through all of them but
23  you've got a number of them. Correct?
24      A.  That's correct.
25      Q.  And one complaint is that the Final Consent

Page 19

1  Judgment is -- is just too much, that that number is too
2  high. Right?
3      A.  Yes.
4      Q.  Okay. And you think that a two and a half
5  million dollar number on a 700 or 800 thousand dollar
6  set of forgeries is just more than you're willing to
7  tolerate?
8      A.  I don't think it's reasonable.
9      Q.  Okay. And what part of that do you think is
10  unreasonable?
11      A.  Well, in the sale of the company,
12  Mr. Kastleman got 50 percent of the sale; on top of that
13  he wants another $2.5 million on a 500,000-dollar
14  investment that he put in.
15      Q.  How much is that Nexteligent stock worth
16  today?
17      A.  I don't know, I wasn't tracking it.
18      Q.  Yeah. What was the highest that that stock
19  ever traded for?
20      A.  I think the highest it traded for was $2.
21  Post acquisition, it was 15, 16 cents, maybe 18 cents.
22      Q.  Right. So that stock is not really worth very
23  much, is it?
24      A.  Not today but the Settlement Agreement stated
25  that we had until December 31st, 2021, for it to hit $2

Page 20

1  and if it did, Mr. Kastleman would be paid in full.
2      Q.  Right. And if not, he got to execute on his
3  Final Consent Judgment. Right?
4      A.  That is correct, for the difference.
5      Q.  And the problem again is what, with the dollar
6  amount in the Final Consent Judgment?
7      A.  I think it's unreasonable. Again,
8  Mr. Kastleman invested $500,000 and Mr. Gilmore invested
9  either two or --
10      (Mr. Raymond Pomante joins via Zoom.)
11      THE WITNESS:  -- two fifty, I forget the exact
12      number, and they want 2.4 plus million dollars
13      back.
14      I've tried multiple times to settle and the
15      response that we got was that Mr. Kastleman
16      doesn't care about the money, he's got more than
17      enough, he wants to punish me.
18  BY MR. WILLIAMS:
19      Q.  Okay. We'll talk further about what you
20  believe is reasonable off the record, I suppose.
21      MR. FURR:  We're always glad to do that,
22      Walter.
23      MR. WILLIAMS:  What's that?
24      MR. FURR:  We're always glad to do that.
25      MR. WILLIAMS:  All right.



STUART ROY MILLER Volume I                         January 29, 2021
IN RE: STUART ROY MILLER                                    21–24

Page 21

BY MR. WILLIAMS:

1
2     Q.   Mr. Miller, in addition to Mr. Kastleman and
3  his entities giving you or loaning you -- I don't think
4  it's a loan but providing you $500,000, they also became
5  shareholders of D.R.G.  Correct?
6     A.   That is correct.
7     Q.   D.R.G. has a -- it's a corporation.  Right?
8     A.   Yes.
9     Q.   And it has a set of by-laws?
10    A.   Correct.
11    Q.   And those by-laws have provisions in it for
12  its officers and directors and how they are to be
13  indemnified in the event that there's litigation against
14  them.  Right?
15    A.   Yes.
16    Q.   Okay.  And on behalf of Mr. Kastleman you've
17  seen my correspondence to your counsel, Mr. Hopkins,
18  requesting that D.R.G. comply with those indemnification
19  procedures.  Correct?
20    A.   There was a great deal of correspondence on
21  that issue.
22    Q.   And one of the things that's required in that
23  indemnification provision and the by-laws is that a
24  independent person come in and evaluate whether or not
25  indemnification is appropriate.  Correct?

Page 22

1     A.   I believe it says something similar to that.
2     Q.   And you never did that, did you?
3     A.   If we recall, we all went back and forth on it
4  numerous times, and you and Mr. Hopkins got to a
5  point -- and it was an issue that was on hold.  It was
6  never determined either way as to whether it should be
7  done or not as we were going through the lawsuit.  Yes,
8  you raised the issue, but Mr. Hopkins challenged it and
9  we continued -- and, you know, it was in discussion
10  numerous times.
11    Q.   So the answer to my question is no, you never
12  went through the indemnification procedure set out in
13  the by-laws?
14    A.   That is correct, for those reasons that I
15  explained.
16    Q.   I noticed that the Shakelford's got a claim
17  for about $170,000 in -- set out in your schedules.  Is
18  that right?
19    A.   Sounds about right.
20    Q.   What portion of that is you and what portion
21  of that is D.R.G. or did they ever break it up?
22    A.   I don't know if it was ever broken up.
23  Sitting here today, I couldn't give you an answer to
24  that.
25    Q.   Okay.  One of the businesses that my clients

Page 23

1  invested in with you is something called A.H.T.
2         Do you remember them or it?
3     A.   Yes, I do.
4     Q.   And something called the Combined Solution.
5  Right?
6     A.   Yes.
7     Q.   And the Combined Solution was a -- well, tell
8  us what the Combined Solution was.
9     A.   There were three companies associated with
10  that.  One was a company owned by Mr. Bill Pollock
11  (phonetic), H.R.A.; a company owned by myself; and
12  another company owned by Spurt Brannon (phonetic).
13  There was an investment made into those companies to
14  support the selling of the services for MD Revolution
15  and Well Track One, and we went and did that and sold
16  quite a bit and those companies couldn't implement those
17  solutions.
18    Q.   Now, when you say "sold quite a bit," what
19  that means is that you found health-care providers that
20  were willing to commit to the services provided by Well
21  Track One and MD Revolution, and your testimony is that
22  they were never able to perform in order to have those
23  customers ultimately pay.  Correct?
24    A.   That is correct.
25    Q.   And so as a result, A.H.T. never received any

Page 24

1  revenue.  Correct?
2     A.   No, there was some revenue received but
3  nowhere near of what it was supposed to be.
4     Q.   Right.  In addition to a little bit of revenue
5  that A.H. received -- A.H.T. received, not -- and,
6  again, not what you were hoping for, you had a signed
7  side agreement with Well Track One and MD Revolution.
8  Right?
9     A.   That is not correct.  I had a signed agreement
10  with MD Revolution that came up much later on.
11    Q.   And that signed agreement was to do what?
12    A.   Consulting services for their operation.
13    Q.   And what were you -- describe the consulting
14  services?
15    A.   To try and help them to figure out how to get
16  their services working.
17    Q.   In addition to that, you were selling as well.
18  Right?
19    A.   I don't think that was part of that agreement.
20  It's from 2014.  I don't recall the exact specifics
21  behind it.
22    Q.   Okay.  And you received how much money per
23  month from, what, MD Revolution for that consulting
24  service?
25    A.   It was somewhere between 10 and 15 thousand



Page 25

1  dollars for a period of, I think, six months or so, to
2  the best of my recollection.
3      Q.  Okay.  And that money didn't go to A.H.T., did
4  it?
5      A.  I think some of it did.  Again, sitting here
6  today, I can't tell you exactly where it went and, in
7  fact, I believe some of that money went to your client
8  as well.
9          There were times he was down in Florida and I
10  had given him checks.  In fact, he came to a Tony
11  Robbins event at the Boca Beach Club.  We had dinner and
12  I had given him a check that night, plus there was
13  another investment that Mr. Kastleman made into A.H.T.
14  for $60,000 and I repaid him a hundred ten, if I'm not
15  mistaken, or 50,000, I paid him 110 on that.
16      Q.  And that was the agreement.  Right?
17      A.  No, that was a separate agreement.  That was
18  the second one.
19      Q.  No.  I'm saying that that repayment, 110 on
20  50, that was the agreement that you made with him?
21      A.  No.  There were three investment agreements in
22  total with him.
23      Q.  Okay.
24      A.  Maybe I'm not following you.
25      Q.  Yeah, I don't think you are.  I'm not asking a

Page 26

1  very good question.
2          With respect to the 50,000-dollar agreement,
3  the agreement was that he would get 110 or 100 thousand
4  dollars back?
5      A.  It was actually 100 and I wound up giving him
6  110 because he then complained about legal fees and
7  writing the agreement but, yes.
8      Q.  Okay.  And where did that money come from to
9  pay him back?
10      A.  It came back through those consulting fees
11  that I was getting.
12      Q.  Well, you just testified that you got $10,000
13  a month or so for about six months.
14      A.  Uh-huh.
15      Q.  Where did -- and that's $60,000 or $70,000.
16      A.  Uh-huh.
17      Q.  Where -- what money did A.H.T. earn on that
18  contract in order to be able to pay Mr. Kastleman back?
19      A.  There were also times when we got money from
20  Well Track One which was used to pay Mr. Kastleman back
21  for the first investment and then on the second
22  investment as well.
23      Q.  All right.  Is there -- you've testified that
24  your -- that bookkeeping and accounting is not your
25  strong suit.  Right?

Page 27

1      A.  Yes.
2      Q.  Okay.  And you understand that -- that that's
3  important.  I mean, you're -- you're sitting right here
4  in this set of circumstances with a set of books that --
5  you know, that started out as -- you really don't know
6  what's there.  Right?
7          MR. FURR:  Object to the question because --
8          MR. WILLIAMS:  It's a bad question.  I'll
9  withdraw it.
10          MR. FURR:  Yeah, thank you.
11  BY MR. WILLIAMS:
12      Q.  The -- you testified that the bookkeeping is
13  not your strong suit.  Correct?
14      A.  Correct.
15      Q.  And, in fact, A.H.T. did not have a set of
16  books, did it?
17      A.  I don't think that's correct.
18      Q.  You think it did?
19      A.  Yeah.
20      Q.  Okay.  Who did -- who created those books?
21      A.  I -- I think I would have created them and
22  then I know Mr. Kastleman and his group also worked on
23  them as well --
24      Q.  All right.
25      A.  -- as well as Jennifer Moody.

Page 28

1      Q.  You have described a contract with some
2  health-care related entity that provides you with a --
3  some 1099 income.
4          Did -- did we -- do we know who that entity
5  is?
6      A.  Yes.
7      Q.  What is the name of it?
8      A.  The Business of Health Care, LLC.
9      Q.  Do you have an ownership interest in that
10  business?
11      A.  I do not.
12      Q.  Do you know who the principals are?
13      A.  I do.
14      Q.  What are their names?
15      A.  Jonathan Roth.
16      Q.  I'm sorry, how do you pronounce that last
17  name?
18      A.  Roth, R-o-t-h.
19      Q.  Got it.  And where is its main headquarters?
20      A.  I believe it's Wyoming is where it's
21  domiciled.  So Roth is in Rhode Island and Bo -- in the
22  Massachusetts area.
23      Q.  And how did you come to know Mr. Roth?
24      A.  Through various, you know, different business
25  relationships.



STUART ROY MILLER Volume I
IN RE: STUART ROY MILLER

January 29, 2021

29—32

Page 29

1    Q.  Can you be more specific?

2    A.  Can I be more specific?  Yes.  Through Anthony

3  Damore.

4    Q.  And Mr. Damore, he's the guy that works in the

5  LED lighting business?

6    A.  Yes.

7    Q.  And how do you know Mr. Damore?

8    A.  Oh, God.  I've known him going back many years

9  through my transportation business.

10    Q.  Okay.  So I'm going to ask -- this is a

11  difficult question and it's going to sound flippant.  I

12  really don't mean for it to be, I just want to know so I

13  apologize in advance.

14    You have associated with Howard Sperling, who

15  is a -- a convicted felon.  Correct?

16    A.  Yes.

17    Q.  And you have associated with a fellow named

18  Steve Lash who is a convicted felon.  Correct?

19    A.  Yes.

20    Q.  Is Mr. Roth -- did he have any background --

21  has he been convicted of anything as far as you know?

22    A.  No, not that I know.

23    Q.  What about Mr. Damore?

24    A.  I don't know.

25    Q.  Are there -- is there anybody that you're

Page 30

1  currently associated with professionally other than

2  Mr. Sperling that is a convicted felon?

3    A.  Not that I'm aware of.

4    Q.  Your disability payment with Northwestern

5  Mutual, does it depend on -- does the continued receipt

6  of those benefits depend upon your income?

7    A.  I'm not sure I'm understanding your question.

8    Q.  Well, if you won the lottery tomorrow and

9  became a billionaire, would Northwestern Mutual have an

10  obligation to continue paying your disability benefits?

11    A.  I don't know the answer to that question.

12    Q.  Okay.  Do you have some concern that your

13  association with Mr. Sperling is going to negatively

14  impact your business reputation?

15    A.  No.

16    Q.  Why not?

17    A.  People have histories and if they are honest

18  and straightforward, I don't -- I don't know why it

19  would hurt my -- my reputation.  I've -- I have a

20  relationship with Mr. Kastleman.

21    Has he ever been accused of anything?  I mean,

22  that could -- I don't understand the question, you know,

23  what one thing has to do with the next.

24    Q.  You have kids.  Right?

25    A.  Sure do.

Page 31

1    Q.  What would you think if your kids were hanging

2  out with a bunch of felons?

3    MR. FURR:  Let me -- let me object.  This is a

4  2004 Examination.  This is not a question about

5  what he might or might not do.

6    MR. WILLIAMS:  I think I made my point.

7    MR. FURR:  Well, you know, you can make your

8  point but --

9    MR. WILLIAMS:  All right.

10  BY MR. WILLIAMS:

11    Q.  Mr. Miller, at the beginning of this

12  examination, you testified that you personally put in

13  somewhere between 100 and 150 thousand dollars into

14  D.R.G.  Is that right?

15    A.  Yes.

16    Q.  And -- and you think that there is some bank

17  statement or some other record demonstrating that Stuart

18  Miller personally -- money that he has that belongs to

19  him individually went into D.R.G.?

20    A.  Yes, I do.

21    Q.  Okay.

22    A.  As I said before, I don't think there was a

23  big chunk that was written.  I can tell you, for

24  example, when Steve Lash came on, I was paying him quite

25  a bit of money before any investments came in and that

Page 32

1  was coming from Stuart Miller and/or entities that

2  Stuart Miller was associated with.

3    Q.  Okay.  So let's -- let's stop with that.

4  Stuart Miller and/or Stuart entities that Stuart Miller

5  is associated with, what would those entities be that

6  you're associated with?

7    A.  It could have been any one of the entities I

8  was associated with.  You're going back to 2016.  I --

9  sitting here today, I couldn't answer the question.

10    Q.  A.H.T.?

11    A.  Could be one of them.

12    Q.  H.R.M.?

13    A.  I was not associated with H.R.M.  I didn't

14  control that company.  I didn't have any ownership in.

15    Q.  Oh, okay, I'm sorry.

16    So that A.H.T. was part of -- that was your

17  company that helped work on the Combined Solution thing.

18  Right?

19    A.  Yeah, amongst other things.

20    Q.  Okay.  Okay.  So your -- but do you think that

21  we're going to see in a bank statement or otherwise a

22  deposit personally made by Stuart Miller into a D.R.G.

23  bank account?

24    A.  I don't know sitting here today.  What I can

25  tell you is there are definitely funds that Stuart



Page 33

1  Miller paid on behalf of D.R.G. on those expenses
2  starting in August of '16 through October of '16.
3     Q.  Okay.  So -- and you're saying that you paid
4  those personally?
5     A.  I said I paid them personally and/or possibly
6  through other companies, yes.
7     Q.  I'm -- I'm sorry, I think I'm being obtuse.  I
8  apologize.  What I'm trying to get to, Mr. Miller, is
9  that when you say "and/or entities you control," my
10  concern is that that's where all the money came from, is
11  entities that you control and none of it came from you
12  personally.
13     A.  Okay.  Sorry, I didn't mean to jump in on you.
14     Q.  That's all right.  Do you understand the
15  distinction I'm trying to make?
16     A.  Yes.  And that's not an accurate distinction.
17  I can tell you unequivocally that monies I got from
18  disability went to pay him in some cases.
19     Q.  Okay.  And there's record of that in the
20  D.R.G. financials somewhere?
21     A.  Or in my personals, yeah.  I would say so,
22  yes.
23     Q.  Okay.  All right.
24        On your Schedules, there is a -- there's
25  litigation involving Applied Revenue Analytics in Tyler,

Page 34

1  Texas, and their claiming is for 350,000 or that's how
2  much you put there.
3        Tell me -- tell me about that lawsuit.
4     A.  Applied Revenue Analytics was a software
5  company that was engaged to utilize their software to
6  work medical denial/denied claims.
7     Q.  Uh-huh.
8     A.  It was a very bad -- a poorly negotiated
9  contract in that the contract was set up in such a way,
10  according to the terms of it which we didn't agree with
11  which is why we're in a lawsuit, that regardless of
12  whether we use the software or not we had to pay in full
13  for the services.
14     Q.  And was a judgment ever entered against
15  D.R.G.?
16     A.  I'm not sure if it was entered or not, to be
17  honest with you.  I know -- I'm not sure.
18     Q.  In early -- I'm sorry.  In 2020, not 2021, you
19  had an interest in something called JRS Health Solutions
20  or something like that.  Is that right?
21     A.  Yes.
22     Q.  And that was a company that you formed.
23  Correct?
24     A.  The three of us formed it, yes.
25     Q.  Okay.  But you're -- okay, three of you formed

Page 35

1  it, but you were one of the original forming people.
2  Correct?
3     A.  Yes.
4     Q.  And you had a one-third interest -- ownership
5  interest in the company?
6     A.  That is correct.
7     Q.  And -- but you resigned that interest?
8     A.  That is correct.
9     Q.  Does JRS Health Solutions have an operating
10  agreement?
11     A.  I believe it does.
12     Q.  Did it have counsel create that operating
13  agreement?
14     A.  No.
15     Q.  Okay.  Who created the operating agreement?
16     A.  It would have been a -- a standard template
17  that would have been used.
18     Q.  Who got the template and used it?
19     A.  I think it was Rick Falcha.
20     Q.  Okay.  Do you -- do you have a copy of that
21  agreement?
22     A.  I do not know.  I don't believe I do.  I
23  looked for it and I don't -- I could not find a copy.
24     Q.  Why did you resign your interest in JRS?
25     A.  I resigned my interest in JRS for a host of

Page 36

1  reasons.  I was in litigation with Kastleman.  Again, I
2  did not want my partners to have to deal with
3  Mr. Kastleman going after that company and so I thought
4  it would be in the best interest for me to step aside
5  and let them run their business.
6     Q.  Okay.  That's one reason.  You said "a host."
7     A.  No, that was the reason.
8     Q.  Okay.
9     A.  It was a poor choice of words.
10     Q.  One giant reason right there, huh?
11     A.  Yep.
12     Q.  Okay.  You were kind of the lead person in the
13  JRS effort to enter into a P.P.E. contract with Office
14  Depot?
15     A.  I don't think that's a fair statement.  The
16  original contract, the connection was originally through
17  Dr. Bishop, through his connection to Office Depot, and
18  then Rick and I negotiated that first contract and then
19  I was involved in the renewal for them, yes.
20     Q.  And it was a pretty big contract.  Right?
21     A.  Yes, it was.
22     Q.  And I think I saw a number of 20 million
23  bucks.
24     A.  For what?  Where did you see that number?
25     Q.  There was some contract where you were



STUART ROY MILLER Volume I
IN RE: STUART ROY MILLER

January 29, 2021
37–40

Page 37

1  supposed to deliver a large set of P.P.E. in exchange
2  for $20 million?
3      A.  No.  The contract value was far greater than
4  that, actually.
5      Q.  How much was it?  What's -- what was the value
6  of the contract?
7      A.  Probably about 200 million.
8      Q.  Okay.  Office Depot sent JRS money, about
9  10.5?
10     A.  I'm sorry?
11     Q.  Office Depot put a deposit down with JRS of
12  about $10.5 million.  Correct?
13     A.  That was one of them.
14     Q.  Where is that money now?
15     A.  It went to the suppliers.
16     Q.  What's the name of the suppliers?
17     A.  They're a host of them.  I don't know all of
18  them off the top of my head because I was not involved
19  in all of it.  I can tell you a couple that I know.
20     Q.  Okay.
21     A.  One is -- bear with me a second -- Genesis,
22  one is -- what is the other one?  Kakama Medical
23  (phonetic).
24     Q.  What was -- what was Mr. Sperling's
25  involvement in the Office Depot contracts?

Page 38

1      A.  He was involved -- he would -- when you
2  purchase P.P.E. in this current environment, we had
3  to -- the companies had to pay a hundred percent in
4  advance.  Mr. Sperling's companies or companies that
5  he's associated with was financing the other 50 percent
6  of that.
7      Q.  So are you saying that all the P.P.E. has
8  been -- has been paid for at this point and is just
9  waiting to be delivered?
10     A.  That's not what I said.
11     Q.  Okay.
12     A.  I said that it has been -- much of it has been
13  paid in full.  There is a -- an issue of contention with
14  Office Depot where they interfered and contacted
15  suppliers we were buying from.  They got a cease and
16  desist letter.  Then they wouldn't take certain product.
17  There's a whole bunch of issues there.
18     Q.  So where are Genesis and Tocala {verbatim}
19  Medical located?
20     A.  One, I believe, is in China.  I believe the
21  other is Malaysia or maybe Thailand.  I'm not a hundred
22  percent sure.
23     Q.  So it's your testimony that there should be
24  banking records that demonstrate where that 10.5 million
25  went and that it went to suppliers whose job it was to

Page 39

1  fulfill, at least part, of the contract with Office
2  Depot?
3      A.  Yes.
4      Q.  And it is further your testimony that -- and
5  do you know how to get in touch with those folks?
6      A.  No, I don't.
7      Q.  You don't.  Who -- who was the interface
8  between JRS and those suppliers?
9      A.  There were several of them.  I'd have to talk
10  with the team and find out exactly who handled each
11  piece of it.  I don't know off the top of my head.
12     Q.  Who are the -- who are all the members of the
13  JRS team?
14     A.  So Rick Falcha and Dr. Bishop.
15     Q.  Okay.  Anybody else?
16     A.  No.
17     Q.  Okay.
18     A.  Other than myself.  I've been involved which
19  was stated earlier.
20     Q.  Are you currently helping them?
21     A.  Yes.
22     Q.  Okay.  What is your deal with them in the
23  event that this all works out and that JRS delivers
24  P.P.E. and Office Depot sends you $200 million?
25     A.  That was like a really combined question that

Page 40

1  doesn't make a lot of sense to me.
2      Q.  Do you have any kind of agreement or handshake
3  deal with JRS for your compensation in the event JRS
4  gets some money?
5      A.  Yes, there's a handshake deal on a commission
6  agreement.
7      Q.  Okay.  What is that deal?
8      A.  I believe it's ten or 15 percent of profits.
9      Q.  Is it ten or is it 15?
10     A.  I -- I'm not sure.  I have to talk to them.  I
11  don't remember exactly.  It's one of the two.
12     Q.  Now, you're aware that Office Depot is suing
13  JRS and its principals.  Right?
14     A.  I've been made aware of that, yes.
15     Q.  Okay.  And is it -- it sounds to me like it's
16  your contention that -- that the only reason there's a
17  problem here is because Office Depot got in the middle
18  of your -- your transactions with your suppliers.  Is
19  that right?
20     A.  That's an oversimplification but I think
21  that's a fair statement.
22     Q.  Okay.  And -- and so does JRS, to your
23  knowledge, have the -- intend to file counterclaims
24  against Office Depot for that interference?
25     A.  It's my belief that that is the case, yes.



STUART ROY MILLER Volume I
IN RE: STUART ROY MILLER

January 29, 2021
41–44

Page 41

1    Q.   And then if -- if JRS prevails and there's
2  some -- I don't want to call it a windfall but I don't
3  know what else to call it -- settlement with Office
4  Depot, then -- then you would -- would you benefit from
5  that settlement?
6    A.   I don't know the answer to that.  We've not
7  discussed that at this point in time.
8    Q.   Okay.  So I -- I meant to ask this.  I don't
9  know if I asked it.  Your -- your deal with them is ten
10  or 15 percent of the profits?
11    A.   Yes.
12    Q.   And is it ten or 15 or just kind of whatever
13  feels right in that range?
14    A.   No, I believe there's a specific number.  I'm
15  just not sure what it is sitting here today and I don't
16  want to commit without confirming.
17    Q.   All right.  Do -- do you have -- is it written
18  down on a piece of paper or something?
19    A.   Not in my possession.  It was always discussed
20  and I would talk with them and -- and find out what the
21  number is.
22    Q.   Okay.  So you think somebody has written it
23  down?
24    A.   I don't know.
25    Q.   Okay.  Who opened JRS's bank account?

Page 42

1    A.   I believe it was Rick and myself.
2    Q.   Okay.  And were you a signer on that bank
3  account?
4    A.   For a short period of time, yes.
5    Q.   Okay.  If you were to ask JRS for its bank
6  statements, would they -- or have you asked JRS for
7  their bank statements?
8    A.   I have not.
9    Q.   Do you think they'd give them to you?
10    A.   I have no idea.
11        MR. WILLIAMS:  Does anybody mind if we take a
12  short break?  I may be done but I want to confer.
13        MR. FURR:  Sure.
14        MR. WILLIAMS:  All right.
15        MR. SHRAIBERG:  No objection.
16        MR. WILLIAMS:  Thank you.
17        THE WITNESS:  When do you want to reconvene?
18        MR. FURR:  Stay on the line, everybody.  Just
19  when someone is ready, speak up.
20        MR. WILLIAMS:  Okay.  How about just ten
21  minutes?  Okay?
22        MR. FURR:  It's 2:37 so like 2:50?
23        MR. WILLIAMS:  Perfect.
24        MR. WOOD:  Okay.  Sounds good.
25        (Thereupon, a recess was taken.)

Page 43

1  BY MR. WILLIAMS:
2    Q.   Mr. Miller?
3    A.   Yes.
4    Q.   I do have some more questions.
5        You talked about a couple of these new
6  entities and they -- but I want to get some clarity.
7  There is something called HMMCGM, LLC, with Henry Miller
8  as the manager.
9    A.   Yes.
10    Q.   Tell me about that entity.
11    A.   It was an entity that I started for my son.
12  As I stated in this morning's deposition, I was going to
13  get him into business and work with him to start a
14  company on something that he was interested in, and he
15  decided to go back to school so we did not do anything
16  with it.
17    Q.   What was the business?
18    A.   We hadn't decided yet.  We just put a place
19  holder out there and we were going to figure it out, and
20  we -- he decided to go back to school, as I said.
21    Q.   Okay.  Then there's something called HMMSRM,
22  LLC.
23    A.   Yeah.  They were open, I believe, the same day
24  or within a day of one of another.  I originally meant
25  to set up HMMCGM and I did it as HMMSRM by mistake and I

Page 44

1  did not cancel it.  I'm just going to let it close.
2  (Simultaneous cross talking) out --
3    Q.   They're just -- they're just (Simultaneous
4  cross talking) --
5    A.   (Simultaneous cross talking)  Yeah.
6    Q.   I got it.
7        Then there's something called RMG Healthcare
8  Services Incorporated.  Tell me about that.
9    A.   That's a health-care consulting company that
10  I -- I formed in around April of 2020.  As I said
11  earlier, I saw the handwriting on the walls with
12  Nexteligent, looking like they were going to fail and I
13  was looking to start a business for myself.
14    Q.   RMG Healthcare Services Inc, isn't that a name
15  or the RMG part anyway, doesn't Nexteligent own that --
16  that name or those initials?
17    A.   I don't believe so.  They bought the assets of
18  Denials Recovery Group.
19    Q.   Right.  And one of those would have been the
20  assumed names.
21    A.   It was a -- name used in the contract.  I
22  mean --
23    Q.   Okay.
24    A.   -- it was three initials.
25    Q.   Okay.  And then -- but why use that -- why use



STUART ROY MILLER Volume I
IN RE: STUART ROY MILLER

January 29, 2021
45–48

Page 45

1  that name because clearly it's -- I mean, we're all --
2  everybody that's asked questions has asked you about it,
3  wondering why they're so close in -- in -- in the way
4  those names have been set up.  Why -- why did you do
5  that?
6      A.  Because I like the initials.
7      Q.  What -- okay.  And then we've got RMGHX, LLC.
8  What is that?
9      A.  I don't believe that's me.  I don't know what
10  that is.
11     Q.  RMGHX, LLC?
12     Q.  RMGHX, LLC?
13     Q.  Yeah.
14     A.  Oh.  RM -- sorry.  So, yeah, I created -- I
15  created another company that I was going to use for
16  other services other than health-care.
17     Q.  Like what?
18     A.  If I got into supply chain consulting again.
19     Q.  Okay.  So why -- why do you have -- why have
20  two companies if you're just one guy?
21     A.  I don't have a good answer for you on that.
22     Q.  I'm looking at a chart of all the companies
23  that you've had, appear to kind of own or control or at
24  one point owned or controlled and there's like 14 of
25  them.

Page 46

1      A.  Uh-huh.
2      Q.  And does that -- tell me why you do it that
3  way, where you have just so many different entities.
4      A.  They're all different times and different --
5  different businesses --
6      Q.  Okay.
7      A.  -- or potential different businesses.
8          MR. WILLIAMS:  I'll pass the witness.
9          CROSS-EXAMINATION (STUART ROY MILLER)
10 BY MR. SHRAIBERG:
11     Q.  Hi, Mr. Miller.  I'm Brad Shraiberg, counsel
12 for Office Depot.  How are you doing?
13     A.  Good.  How are you?
14         MR. SHRAIBERG:  And I don't mean to step on
15 anyone's toes.  Did someone else want to go next?
16 Is it all right if we go?
17         MR. WILLIAMS:  Go ahead.
18         MR. FURR:  Okay.
19         MR. SHRAIBERG:  Thanks.  Just a housekeeping
20 question.  How -- how long are we going to go this
21 afternoon?
22         MR. FURR:  Well, I'd like to stop at
23 4:00 o'clock because Stuart is taking morphine, he
24 gets very tired at the end of the day.  So if we
25 could do that, I would be appreciative.

Page 47

1      How are you feeling, Stuart?
2          THE WITNESS:  I'm hanging in there.
3          MR. SHRAIBERG:  Okay.  Why don't I just start.
4  If I find a good place to -- to stop, I'll say that
5  this is a good transition point and we could pick
6  it up at a Continued 2004.  Does that work?
7          MR. FURR:  Yeah, yeah.  Let me just say
8  something else to you, Mr. Shraiberg.  The JRS and
9  the people who own JRS who are being sued by your
10 client have their own sets of lawyers, a commercial
11 law firm in Miami.  I can't think of the name of it
12 right now.  They were not noticed to be here today.
13 So I'm certainly glad to have Stuart answer
14 questions regarding his personal business affairs
15 as it relates to him getting money out of Office
16 Depot or his involvement to some extent, but to get
17 into the whole deal without the other side being
18 there, I don't think is really fair.  So I
19 encourage you to try to keep your questions
20 directed to his personal financial -- personal
21 bankruptcy -- and your client is a creditor
22 obviously -- and then we can later talk about the
23 other testimony.
24         MR. SHRAIBERG:  Well, if possible, I would
25 like to at least go through a little bit of what

Page 48

1  his personal knowledge is versus maybe corporate
2  information.
3          MR. FURR:  Yeah.  Yeah, he doesn't have any of
4  the records of JRS.  I don't think they've been
5  produced.  Correct, Stuart?
6          THE WITNESS:  That's correct.
7          MR. FURR:  Yeah.  So he might remember --
8  whatever, that's going to a separate deposition.
9  I'm sure you're going to have both sides
10 represented and the production of documents and
11 whatever.
12         MR. SHRAIBERG:  Okay.  So I'll -- I'll -- I'll
13 stick to some questions -- I'll start now with just
14 some overview questions of what he in particular
15 knows with regard to Office Depot, JRS --
16         MR. FURR:  Yeah, I think that's fair; that's
17 fair.
18 BY MR. SHRAIBERG:
19     Q.  All right.  Mr. Miller, just a couple of rules
20 that haven't really been discussed with regard to today
21 from any of the parties that have been asking you
22 questions.
23         If for some reason you don't understand a
24 question that I'm asking, please just ask me to rephrase
25 it.  And do me a favor, if you can, to allow me to try

Page 49

1  to finish asking a question if I start because it's
2  difficult to take both of us talking at the same time.
3        And, finally, if you can, answer yes or no
4  questions with an actual "yes" or "no" instead of a
5  "uh-huh" or "huh-uh."
6        Do you understand those rules?
7     A.  I do.
8     Q.  Perfect.  What's your highest level of
9  education?
10    A.  A bachelor in fine arts.
11    Q.  From where?
12    A.  Rochester Institute of Technology.
13    Q.  When did you get that?
14    A.  I graduated in '91, I believe it was.
15    Q.  Do you have any background in -- I'm sorry?  I
16  thought I heard someone.
17        Do you have any background in the health-care
18  field?
19    A.  Yes.
20    Q.  Sorry, I didn't mean to cut you off.
21    A.  That's okay.  Go ahead, ask your follow-up.  I
22  think you're going to answer my question.
23        I didn't hear you.  I'm sorry?
24    Q.  No problem.  What is that background?
25    A.  Oh.  Just that I've been involved in the

Page 50

1  health-care business since 2013 or '14 in various areas
2  of billing, clinical, Medicare services, supply chain on
3  the health-care side and some other things as well.
4     Q.  I didn't get all of that.  Billing, clinical.
5  Then what?
6     A.  Supply chain as it relates to health-care,
7  terms of sale, terms of purchase, and I've been involved
8  in -- in various products in health-care as well over my
9  career.
10    Q.  Let me concentrate on one of those elements
11  that you just described.
12        Supply chain as it pertains to health-care,
13  what does that mean?
14    A.  So inventory management, purchasing, terms of
15  sale, terms of purchase, tracking product through the
16  four walls of the facilities, things of that nature.
17    Q.  Inventory management, give me an example of
18  some experience you have with regard to inventory
19  management.
20    A.  Sure.  So in 1998 or '99, we wrote a -- in one
21  of my companies, we wrote a software package that
22  tracked inventory from the warehouses of the hospitals
23  directly to the operating rooms because they were losing
24  a fair amount of hardware, hip replacements and things
25  like that, so we developed a wireless solution to track

Page 51

1  those products.  That's just one of a couple.
2     Q.  Okay.  You said "one of my companies back in
3  '98 or '99."  Which company was that?
4     A.  A company called TransportGistics.
5     Q.  What was your role with regard to
6  TransportGistics?
7     A.  Yeah, I was a founder.  My brother and I were
8  business partners.
9     Q.  You were a founder.
10        What experience did you have at that time with
11  regard to software and inventory management?
12    A.  So when I got out of college, I realized I
13  could not make the living that I wanted to doing the
14  fine arts and photography.  I worked for a couple of
15  companies and then decided to go into business.  My
16  family had a transportation management business and I
17  learned it from the ground up from when I was in high
18  school.
19    Q.  What does transportation management entail?
20    A.  Oh, God.  It's the -- it encompasses
21  everything from the ordering of product for the movement
22  and delivery, to warehousing, forecasting, bills of
23  lading, auditing, payment.  There are a whole host of
24  services that I learned through that endeavor.
25    Q.  What was your role in that company?

Page 52

1     A.  TransportGistics?
2     Q.  Yep.
3     A.  I was an Executive Vice-President.  I actually
4  headed up sales and -- and developed a bunch of products
5  for them as well.
6     Q.  You developed a bunch of products.  What --
7  what's -- what types of products?
8     A.  For example, a return authorization product.
9  One of our clients back at the time was Black & Decker.
10  They were having a problem with their product returns
11  coming back from the big-box retailers, the Kmarts, the
12  Walmarts and Sears back then.  They couldn't track it.
13  They were being double billed so I developed a piece of
14  software that would track that, issue the bill of lading
15  and then track the debits coming into their systems.
16    Q.  You developed a piece of software.  Do you
17  know what does that -- you literally created the
18  software?
19    A.  I wrote the system spec and gave it to our
20  coders, yes.
21    Q.  Where did you learn that skill?
22    A.  Just by doing it.
23    Q.  You literally created the software or you gave
24  someone an idea and they created it for you?
25    A.  No, no, I wrote the system specifications from



Page 53

1  start to finish.
2      Q.   How did you get trained to do that?
3      A.   I trained myself.
4      Q.   Through what?
5      A.   I'm sorry?
6      Q.   Through what?
7      A.   Just by learning, by reading, by experiencing
8  what people do in their business, listening to people,
9  understanding what their problems are and developing a
10  solution based upon it.
11      Q.   Is that software that you created something
12  that could be used in other forums or is it just -- is
13  it unique just to that one company?
14      A.   It was very specific to those services that it
15  was used for a couple of clients that we had.
16      Q.   Do you have a copyright as to that software?
17      A.   No, no.  The company -- the old company owns
18  it.  I didn't own it.
19      Q.   What's that company?
20      A.   It's still in existence today.
21      Q.   Was it sold?
22      A.   No.  It's still in existence today.
23      Q.   Does it operate?
24      A.   I believe so, yes.
25      Q.   Do you have an ownership interest in it?

Page 54

1      A.   No, no, no, no.  I got out 2012 or '13, maybe
2  even before that.
3      Q.   When you say you got out, what did you do?
4  Did you sell your ownership interest?
5      A.   Yeah.  I gave my interest back to my brother.
6  I sold it back to him.
7      Q.   For how much?
8      A.   Oh, I don't even remember at this point.  It
9  was a couple hundred thousand dollars, I think, paid out
10  over time.
11      Q.   Did your brother pay it in full?
12      A.   Yes.
13      Q.   How long of a time frame was the payout?
14      A.   I -- I don't recall at this point.
15      Q.   Do you know when he satisfied that obligation?
16      A.   It was probably like 2000 -- I think I left
17  in -- in -- it was right consistent with the divorce.  I
18  think I left like in '10 or '11 and it was paid out
19  either by '12 or '13.
20      Q.   Because I'm on a little bit of a time crunch,
21  I'm going to jump ahead and we'll come back to this when
22  we continue the 2004 exam.
23          What's JRS Health Services LLC?
24      A.   It's a company that offers various P.P.E. and
25  products.

Page 55

1      Q.   What does JRS Health Services stand for?
2  Where did you come up with the name?
3      A.   It was originally -- I believe Jeff, Rich and
4  Stuart is what it stood for.
5      Q.   You were obviously Stuart.  Who is Rich?
6      A.   Richard Falcha.
7      Q.   Can you spell the last name, please?
8      A.   F, as in Frank, -a-l, as in Larry, -c-h-a, I
9  believe it is.
10      Q.   And who's Jeff?
11      A.   Dr. Jeff Bishop.
12      Q.   When was JRS Health Services formed?
13      A.   I believe it was April or May in 2020.
14      Q.   And when it was formed, were Dr. Bishop,
15  Mr. Falcha and yourself equal one-third partners?
16      A.   That is correct.
17      Q.   Did you have equal one-third ownership
18  interest in the company?
19      A.   We did.
20      Q.   Whose idea was it to form the company?
21      A.   I think -- well, Dr. Bishop brought the three
22  of us together and that's what created it.
23      Q.   Prior to the formation of this company, did
24  you know Dr. Bishop?
25      A.   I did.

Page 56

1      Q.   How long have you known Dr. Bishop?
2      A.   Probably going back to 2008 or '9, I think it
3  is.
4      Q.   Were you friends?
5      A.   I was introduced to him through a mutual
6  colleague and became friends and business associates,
7  yes.
8      Q.   Have you ever been in a business venture with
9  Dr. Bishop prior to JRS?
10      A.   I've worked with him before.  I don't think we
11  had any business ownership together but I've worked with
12  him before.
13      Q.   When you say you've worked with him before, in
14  what context?
15      A.   So when I was working with -- in 2014, when I
16  was working with MD Revolution and WellTrackOne, I -- I
17  worked with Dr. Bishop to help me get into various
18  medical practices.
19      Q.   To sell your product?
20      A.   Services, yes.
21      Q.   What's Dr. Bishop a doctor of, what type of
22  doctor is he?
23      A.   I believe he's a D.O. and I believe he had a
24  large pediatric practice, and then when I met him, I
25  believe he was an administrator at Wellington Regional.



STUART ROY MILLER Volume I
IN RE: STUART ROY MILLER

January 29, 2021
57—60

Page 57

1  Q.  Is he still with Wellington Regional today?
2  A.  No, no.
3  Q.  Do you know where he is today or where he
4  works today?
5  A.  I think he's got a number of positions.  I
6  know he's involved with a medical school in Florida.
7  He's an entrepreneur and has multiple businesses.
8  Q.  Does he have an existing medical practice
9  right now?
10  A.  I do not believe so.
11  Q.  And are you social friends with Dr. Bishop?
12  A.  Yeah, I would say that.
13  Q.  When was the last time you spoke with
14  Dr. Bishop?
15  A.  Probably last week or maybe the beginning of
16  this week.
17  Q.  What was the nature of the conversation?
18  A.  See how his father was doing.
19  Q.  Is his father sick?
20  A.  Yes.
21  Q.  Did you tell Dr. Bishop that your deposition
22  was being taken today?
23  A.  Yes, I did.
24  Q.  And what did he say about that?
25  A.  Nothing really.

Page 58

1  Q.  Did Dr. Bishop tell you that he was sued as
2  well as JRS Health Services by Office Depot?
3  A.  No.
4  Q.  How did you -- earlier you stated that you are
5  aware that JRS has been sued.
6  How did you become aware of it?
7  A.  I believe it's listed in the -- the claim, and
8  then I also went online to see the court -- the court
9  docket.  To the best of my knowledge, nobody has been
10  served.
11  Q.  Did you speak with Mr. Falcha with regard to
12  the lawsuit, about the lawsuit?
13  A.  I did.  I did.
14  Q.  And what did he tell you?
15  A.  I asked him if he was served and he said no.
16  Q.  What about the merits of the lawsuit?
17  A.  Didn't get into it with him.
18  Q.  Not at all?
19  A.  No.
20  Q.  Prior to the formation of JRS, did you know
21  Richard Falcha?
22  A.  No.  That was -- right around then was the
23  first time I met him.
24  Q.  How did you meet him?
25  A.  Through Dr. Bishop.

Page 59

1  Q.  Are Dr. Bishop and Mr. Falcha friends?
2  A.  Yes.  They were neighbors, I believe, at one
3  point.
4  Q.  Where does Dr. Bishop live?
5  A.  He's in Stuart.
6  Q.  How about Richard Falcha?
7  A.  The Wellington area, Royal Palm Beach.
8  Q.  What's Mr. Falcha's background?
9  A.  He worked for -- I believe he was an executive
10  at Walgreens for many years and then he had worked for a
11  couple of health-care companies after that.
12  Q.  You said he was an executive at Walgreens.
13  Do you know what type of executive?
14  A.  I do not.
15  Q.  And what did he do for the health -- I -- I --
16  what was the rest of your answer, after Walgreens, he
17  went where?
18  A.  He worked for some health-care companies or at
19  least a health-care company I'm aware of.
20  Q.  What did he do for these health-care
21  companies?
22  A.  There was a program that he was involved with,
23  and I don't remember the name of the company, where they
24  were doing some sort of fall-risk assessments inside of
25  nursing homes, I believe.

Page 60

1  Q.  What does that entail?
2  A.  Not really sure.  I -- I know a little bit
3  about it on the fringe.  Don't know a lot about it.
4  Q.  You said JRS offers various P.P.E. when I
5  asked what it does.
6  First of all, just explain what you mean by
7  P.P.E.
8  A.  Everything from gloves, masks, gowns, testing
9  kits, that kind of thing.  Personal protection
10  equipment.
11  Q.  And does JRS handle all of those examples that
12  you just listed or does it only specialize in certain
13  P.P.E.?
14  A.  No.  It's -- it's been involved in -- in many
15  different -- I think all those things that I've
16  mentioned.
17  Q.  You say it's been involved in those things.
18  Did it have any contracts with any customers?
19  A.  It's -- it's not a -- most customers are not
20  contractual based.  Most of it is a spot market.  There
21  have been sales to other customers other than Office
22  Depot.
23  Q.  Do you know what JRS's revenue was in 2020?
24  A.  I don't know off the top of my head.  I mean,
25  I could fathom a guess but I don't know.



Page 61

1    Q.   What -- what's your guess?
2    A.   I would say the revenue is probably around
3  five, seven million dollars excluding the -- the Office
4  Depot glove transaction.
5    Q.   The five to seven million that you just
6  referenced, was that from one contract?  Many contracts?
7    A.   Multiple.
8    Q.   How many are multiple?
9    A.   I'm not sure.  I'd be guessing here.  I would
10  probably say at least five or seven.
11    Q.   Let me back up.  What was your role at JRS?
12    A.   So I would help using my network of
13  health-care people to try and sell product and also to
14  try and find suppliers in cases.  Really, we -- we all
15  participated the same way, in looking for opportunities
16  and then finding resources, suppliers.
17    Q.   I want to dissect what you just said.  You
18  said "we all."  So does that mean that both Dr. Bishop
19  and the -- your other partner with an F --
20        MR. FURR:  Falcha.
21  BY MR. SHRAIBERG:
22    Q.   Yeah -- Falcha, had the same role, you would
23  try to sell product and find suppliers?
24    A.   Yeah, pretty much so.
25    Q.   You said, "pretty much so."  How did it

Page 62

1  deviate amongst the three of you?
2    A.   I would say that Rick Falcha and myself just
3  probably did a lot more than Dr. Bishop.  He was --
4  Bishop probably was more on the sales side than on the
5  supplier side but he did some supply work.
6    Q.   What does supply work entail?
7    A.   Finding suppliers.  Again, there -- this
8  market -- this P.P.E. market is -- is fraught with
9  opportunistic people that don't do business the right
10  way per se and a lot of made-up stories to say the
11  least.  I'm sure you've seen many of them in the news,
12  on the 3M stuff and some of the other things that we've
13  all seen in the news and so, you know, we -- we have a
14  standard source of products for basic commodities, like
15  masks, gloves, gowns and test kits.  And then we would
16  be often asked for things that weren't in our -- in the
17  normal course of business to see if we can get for
18  people, everything from body bags to refrigerated
19  trailers to needles, injection needles, I mean, really
20  anything that was needed.
21    Q.   What experience prior to JRS did you
22  individually have in finding suppliers?
23    A.   Quite a bit.  Quite a lot, actually.
24    Q.   Give me examples, please.
25    A.   So in my supply chain business, one of my

Page 63

1  clients was a division of Texas Instruments that was in
2  cold rolled steel business.  We helped them find better
3  suppliers for certain components that were used in the
4  steel.  We would often help in negotiations.
5        Then in another area, I built a -- a medical
6  product made out of silver for privacy curtains and --
7  and medical tape because silver kills bacteria, it's an
8  antibacterial/antimicrobial.  So I've had experience
9  sourcing that product, both domestically and overseas.
10    Q.   Anything else?
11    A.   There's many others throughout my career.  I'm
12  sorry?
13    Q.   For example, what -- what's another?
14    A.   Oh, God.  So with Black & Decker we were
15  bringing their product back, deconstructing it and
16  selling the raw materials out to people, so that's the
17  converse side of that.  There were cases where we were
18  getting their product back and -- and repairing it for
19  them and -- and sourcing those broken or missing
20  components.
21    Q.   Anything else?
22    A.   That's all I can think of off the top of my
23  head.
24    Q.   I just want to be clear in your answer.  You
25  gave three examples:  One, your supply chain business,

Page 64

1  you generically said that.  Which company is your supply
2  chain business?
3    A.   That was the TransportGistics.
4    Q.   And that operated from when to when or when
5  were you involved with that company?
6    A.   I believe it was -- I finished there somewhere
7  between 2010, '11.  I think it was 2001 or '2 when I
8  started it.
9    Q.   And that dealt with the steel business; that's
10  what you -- was the example you gave?
11    A.   Yes, both the steel and Black & Decker.
12    Q.   Did you import steel in that company?
13    A.   No.  That was all domestically sourced.
14    Q.   You then gave an example of a medical product
15  made out of curtains and silver.
16        What company was that?
17    A.   So I was involved with a company called
18  Silver -- Silver Fabrics and we worked for -- I was
19  doing consulting for -- oh, God, what was the name of
20  that company?  It was a company we were doing consulting
21  for that was actually making the silver -- what they
22  refer to as the silver staple which is the raw material
23  of spinning the yarn.  We then developed the privacy
24  curtain, the --
25    Q.   Let me interrupt you.  You say "we."



STUART ROY MILLER Volume I                                    January 29, 2021
IN RE: STUART ROY MILLER                                      65–68

Page 65

1   Who's we?
2       A.  There were several people involved in that.
3   I -- I developed the tape.  There was another gentleman
4   involved that helped developed the privacy curtains.
5   And then also the bed sheets.
6       Q.  Was that your answer or are you thinking?
7       A.  No, that was my answer unless there was a
8   follow-up question I didn't hear.
9       Q.  That didn't involve -- you did not get any
10  experience importing with that consulting arrangement.
11  Correct?
12      A.  No, I did.
13      Q.  From where?
14      A.  Where did we import from?  Is that what you're
15  asking?
16      Q.  You specifically get experience importing
17  from, yes.
18      A.  Oh.  So it goes back to -- again, it goes back
19  to my transportation supply chain business.  We -- there
20  were many customers we had, ranging from, as I said,
21  Black & Decker, Rite Aid, NASA, a whole host of them,
22  and we were tasked in many cases to help with the terms
23  of purchase and terms of sale components of their
24  agreements and then get involved with the importing of
25  the product, customs, duties and then sourcing.

Page 66

1       Q.  The product, you never had any experience with
2   regard to importing P.P.E.  Correct?
3       A.  Not until we started this business, no.
4       Q.  Did anyone in your company have experience
5   importing P.P.E. prior to starting the business?
6       A.  I'm not sure.
7       Q.  Nothing that comes to mind.  Correct?
8       A.  That is correct.
9       Q.  You said that it was your job to find
10  suppliers or one of your jobs was to find suppliers.
11  Did you find any?
12      A.  Yes.
13      Q.  How many and who?
14      A.  Oh, God, I -- I couldn't tell you off the top
15  of my head.  I'd have to go back and look.  There have
16  been, you know, countless phone calls with both real and
17  fake and I just couldn't answer off the top of my head.
18      Q.  Is it more than one?
19      A.  Probably, yes.
20      Q.  But you don't know for sure?
21      A.  No.  I would say it's probably more than five.
22      Q.  What were the names of those five companies
23  that you remember?
24      A.  Again, I'm not sure.  I'd have to go back and
25  look.

Page 67

1       Q.  Can you name one of them?
2       A.  Yeah, I can.  MedCare is one.  There are a
3   couple of test kit, lab kit, test kit companies that I
4   found both in China and Taiwan.  There were mask
5   companies that I found and glove -- at least one glove
6   company as well.
7       Q.  What's the name of the glove supplier that you
8   found?
9       A.  MedCare was one of them.  Then there were
10  several -- the way this business was done, there were
11  several intermediaries that had existing contracts with
12  the glove manufacturers that I found as well.
13      Q.  Who are the intermediaries?
14      A.  Again, I'd have to go back and look.  I don't
15  know off the top of my head.
16      Q.  You said a few times that you would have to go
17  back and look.  What in particular would you look at?
18      A.  I'd have to go back to Rick and find out the
19  notes that they have on it.
20      Q.  So it was Rick that found the glove supplier
21  or was it you?  My question was you.
22      A.  And it was me.  I'd have to go back to the
23  notes that he has that I don't have in my possession and
24  see who they were.
25      Q.  So Rick has your notes?

Page 68

1       A.  He has copies of everything that I did.  I
2   have copies of everything that he did.
3       Q.  So you have Rick's notes and he has your
4   notes?
5       A.  To some extent yes.  Not in total but at least
6   in some names yeah, I mean, absolutely.  We shared
7   information.
8       Q.  When you say "notes," what are you referring
9   to?  E-mails?  Handwritten notes?  Cocktail napkins?
10  What have we got?
11      A.  Probably all the above.  Actually, I don't
12  think there were really e-mails.  I think most of it was
13  either handwritten or notes in Word, you know, that kind
14  of stuff.
15      Q.  And these notes are contained in a file
16  somewhere?
17      A.  Yes.
18      Q.  Let's talk about what you possess.  You said
19  that you have some of Rick's notes.
20          Where do you keep it?
21      A.  They would probably be on my computer.
22      Q.  So what's on your computer?  E-mails?  Word
23  documents?  PDFs of notepads?
24      A.  Probably a combination of -- of all of those
25  things.  Again, without going and looking very



Page 69

1  specifically, I -- I wouldn't want to make a -- make an
2  incorrect statement.
3      Q.  How long did you work for JRS?
4      A.  Since its inception.
5      Q.  Which was?
6      A.  April, May.
7      Q.  Of 2020?
8      A.  That is correct.
9      Q.  And you still work for them today?
10     A.  I still help them out, yes.
11     Q.  And you don't remember, as you sit here, what
12  context those notes are in?
13     A.  No, I don't.
14         MR. FURR:  Can I just interrupt a second.
15  Stuart, are you okay because you don't look real
16  good.
17         THE WITNESS:  I'm getting pretty tired here.
18  Take maybe a 10- or 15-minute break?
19         MR. SHRAIBERG:  That's fine.
20         MR. FURR:  Yeah.
21         THE WITNESS:  Thanks.
22         MR. SHRAIBERG:  Why don't we reconvene at
23  3:45?
24         THE WITNESS:  You got it.
25         MR. FURR:  Yeah.

Page 70

1         (Thereupon, a recess was taken.)
2  BY MR. SHRAIBERG:
3      Q.  At JRS you said that all three of you had the
4  job of finding suppliers and finding customers.
5  Correct?
6      A.  That is correct, yes.
7      Q.  Did you find the Office Depot customer?
8      A.  Actually, that -- I was involved with it but
9  the original connection came through Jeff Bishop.
10     Q.  And what was that connection?
11     A.  Jeff knew Dave Centrella, which I believe was
12  their interim C.F.O. back when we first started and that
13  was how we got connected.
14     Q.  And what happened from there?  Who originally
15  approached Office Depot?
16     A.  So Jeff originally contacted Dave Centrella
17  and then the three of us were involved in the
18  conversations going forward from there.
19     Q.  The "three of us" meaning Jeff, you and Dave
20  Centrella?
21     A.  No, no, no, I'm sorry.  Jeff, myself, and Rick
22  Falcha, we had spoken to Dave Centrella once or twice
23  and then he connected us to Tina Pruitt.
24     Q.  Can you spell Miss Pruitt's last name for the
25  court reporter?

Page 71

1      A.  It's a hyphenated last name, I forget what the
2  middle is, but it's P, as in Peter, -r-u-i-t-t, as in
3  Tom.
4      Q.  And after these initial conversations, were
5  you the primary liaison between Office Depot and JRS?
6      A.  I would say for the majority of it, yeah.
7  Yeah, in the beginning, it was, like I said, the three
8  of us started it and then Rich and myself continued it
9  and then I was -- I probably became the primary.
10     Q.  You say you started it, continued it and then
11  you became the primary.  What is it?
12     A.  The conversation, sorry.  Communications,
13  yeah.
14     Q.  What conversation?
15     A.  Oh, so we had done -- JRS had done multiple
16  deals with Office Depot.  The first deal was KN95 masks.
17  Office Depot had asked us to quote them on a number of
18  products.  If my memory serves me correct, it was KN95s,
19  ASTM level one, two, and three masks, gowns and there
20  was something else.  There was a spreadsheet that they
21  provided us.  I don't remember all of it, but there was
22  a spreadsheet they provided us with maybe six or ten
23  products they asked us to quote on.  Once that was
24  submitted back to Tina, they then came back -- Tina then
25  came back to us and said that they wanted to start with

Page 72

1  the KN95s.  I believe the initial order was for three
2  million masks.
3         And let me back up.  Before that, a contract
4  was negotiated with Office Depot.  Office Depot's
5  traditional terms are not to pay any money up front.
6  Rich and I explained to them that in this current market
7  money had to be put up front and 99 percent of the time
8  it was a hundred percent.  We negotiated that Office
9  Depot would put 50 percent up and then the other
10  50 percent would be paid upon S.G.S. inspection when the
11  product was ready to be shipped.
12         And so -- so now fast forward to the -- to
13  the -- back to the KN95 masks.  We provided all of the
14  appropriate paperwork that was required, everything from
15  product images to specifications to F.D.A. 510(k)s, to
16  white listed, C.D.C. white lists.  And then Office
17  Depot placed the deposit.  We -- JRS acquired the masks and
18  then delivered them within the time frame that was
19  allotted, and I believe it was three million masks, as I
20  said earlier.
21     Q.  Okay.  I want to back up because you said a
22  lot.
23     A.  A lot of information.  Sorry.
24     Q.  All right.  You said we provided -- I'm
25  paraphrasing now.  You didn't use the word "quotes," but



Page 73

1  you provided quotes with regard to what Miss Pruitt
2  asked you to -- Miss Pruitt asked for you to give a
3  quote with regard to various P.P.E. Correct?
4      A.  That is correct, yes.
5      Q.  And you said that "we provided it."
6      A.  That's correct.
7      Q.  How did you do that? Orally? In person? Or
8  by e-mail?
9      A.  Probably a combination of e-mail and orally.
10     Q.  Now, when you said "we provided it," isn't it
11 true that you, Mr. Miller, individually provided it?
12 You are the one that corresponded with Office Depot.
13 Correct?
14     A.  Yes, but not a hundred percent of the time. I
15 believe that Rick Falcha had some communications with
16 them as well early on.
17     Q.  Okay. But not with regard to the quoting of
18 product and negotiating the deal, the trade vendor
19 agreement that was ultimately entered into with Office
20 Depot. Correct?
21     A.  I was the -- the vocal piece, that's correct.
22     Q.  The sole vocal piece?
23     A.  I don't know that I would agree with that.
24 I'm not trying to be argumentative, but I believe that
25 Rick was involved in the -- certainly in the original

Page 74

1  contract as well, certainly the original contract back
2  in --
3      Q.  With regard to the original contract, there
4  are not e-mails from him to Office Depot. Correct?
5      A.  Again, I'm not a hundred percent sure sitting
6  here today. I thought there were but I'm not a hundred
7  percent sure. I wouldn't, you know, swear to it right
8  now.
9      Q.  At a minimum, you were the primary liaison
10 between JRS and Office Depot. Correct?
11     A.  Sure, yes. Yes, I would agree with that.
12     Q.  And you were the primary person that
13 negotiated the contract with Office Depot. Correct?
14     A.  Certainly on the second contract. I'm not
15 sure on the first one. I thought Rick was involved as
16 well.
17     Q.  When you approached Office Depot telling them
18 that even though it's their policy not to prepay, in the
19 industry it is the norm, what did they tell you? How
20 did they react to that?
21     A.  They said they would have to go back
22 internally and see if that could be done. And -- and I
23 think the original plan was we would do that for a
24 period of time and then potentially eventually get to a
25 point where that didn't have to continue assuming we had

Page 75

1  done enough business to support that.
2      Q.  Did you have to provide Office Depot with any
3  literature or any due diligence as to the experience of
4  JRS prior to entering into the contract with Office
5  Depot?
6      A.  I don't believe so. I -- I really don't --
7  not that I can recall.
8      Q.  To the best of your recollection --
9      A.  Yeah.
10     Q.  -- did Office Depot have any questions with
11 regard to the experience of JRS in this industry?
12     A.  Not to the best of my recollection, no.
13     Q.  So you believe that Office Depot would do no
14 due diligence and just front half of the -- of -- of any
15 order when it's not their industry norm to just any
16 company?
17     A.  Well -- so let me -- let me clarify that a
18 little bit better. While it's not their industry norm,
19 they had done it numerous times during this pandemic
20 with multiple vendors we were told. They were trying to
21 get away from that, but we were not the only vendor they
22 did that with that.
23         Insofar as your question about due diligence,
24 again sitting here today, I don't recall that. I -- I
25 don't know what they would have asked at this point.

Page 76

1      Q.  Did you ever provide Office Depot with a
2  PowerPoint presentation?
3      A.  It's possible. I'd have to go back and look.
4  I truthfully do not recall. There were lots of
5  documents that went back and forth between the -- the
6  entities.
7      Q.  Earlier, you said that it was one of your
8  responsibilities to find suppliers while working at JRS.
9  Correct?
10     A.  Yes.
11     Q.  Is a supplier also a factory or is that a
12 distinction?
13     A.  No, that -- the supplier could be a factory,
14 yes.
15     Q.  You say "could be." What else could it be?
16     A.  No, a supplier -- a factory would be a
17 supplier, but there are other types of suppliers is what
18 I was trying to say.
19     Q.  Sure. What is another type of a supplier?
20     A.  There were contract holders or allocation
21 holders that we would buy -- that we would buy from or
22 buy from.
23     Q.  What does that mean? What's a contract
24 holder?
25     A.  Somebody that holds a contract with a factory.



STUART ROY MILLER Volume I
IN RE: STUART ROY MILLER

January 29, 2021
77–80

Page 77

1  Because what had happened in this business was when the
2  pandemic hit, a lot of the factories' allocations were
3  sold out and the people that were holding those
4  contracts were reselling them at much higher rates to
5  leverage their position because you couldn't get product
6  directly.
7      Q.  Did you individually tell Office Depot that
8  you dealt directly with factories?
9      A.  I couldn't hear you.  Could you say it again?
10     Q.  Sure.  Did you individually tell Office Depot
11  that you purchased directly from factories?
12     A.  In fact, we told Office Depot unequivocally
13  that we buy from allocation holders and factories, and
14  we were very clear that we were buying from
15  intermediaries, and there are e-mails to support that.
16     Q.  You just testified that you said that you buy
17  from both.
18     A.  I'm sorry?
19     Q.  You just testified that you buy from both,
20  factories and intermediaries.
21     A.  Yes, yes.
22     Q.  What's one factory that JRS purchases from
23  directly?
24     A.  The masks were purchased directly from -- oh,
25  God, give me a minute.  I'm drawing a blank on the name.

Page 78

1  I'll come back to that one.
2      But MedCare, gloves is -- is a factory that
3  we -- that we purchase from.  Oh, God, what was the mask
4  name?  I'm drawing a blank.  It will come to me in a
5  minute.  God.  If you don't mind, let's circle back,
6  Brad; it's like on the tip of my tongue and I just can't
7  get to it.
8      Q.  No problem.
9      A.  I'll wind up blurting it out.  I apologize.
10     Q.  Where is MedCare located?
11     A.  MedCare is in China.
12     Q.  And what did you purchase directly from
13  MedCare?
14     A.  Nitrile gloves.
15     Q.  For who?
16     A.  For whom?
17     Q.  Yeah.
18     A.  Various customers.  I mean, I -- I don't know
19  that I can disclose the name because we're typically
20  under -- we can be under N.D.A.s and so I want to
21  confirm that before I give you that name.
22     Q.  Okay.  How many customers do you know of where
23  you bought gloves directly from MedCare?
24     A.  At least -- at least one, maybe three.
25     Q.  Does JRS -- does JRS have a warehouse?

Page 79

1      A.  It does not.
2      Q.  Has it ever had a warehouse?
3      A.  No.  We utilize third parties.
4      Q.  Which third parties?
5      A.  Exact Distribution.
6      Q.  Where are they?
7      A.  Atlanta and California.
8      Q.  And where else?
9      A.  And then there's a group in China that we work
10  with that has warehouses throughout China, also in
11  Malaysia and Thailand, I believe.
12     Q.  What's the name of that group?
13     A.  J -- J -- JKS or JW -- it's JKS Logistics, I
14  believe it is.  Yeah, I think that's the name of it.
15     MR. FURR:  It's 4:00 o'clock.  Do you have a
16  stopping point?
17     MR. SHRAIBERG:  Yeah.  I think we can stop
18  right now.  We'll work on a date to reconvene.
19     MR. FURR:  Okay.
20     MR. SHRAIBERG:  I don't have an objection to
21  that.
22     MR. FURR:  Okay.  We do not waive.
23     THE COURT REPORTER:  Is anybody ordering this
24  part?
25     MR. SHRAIBERG:  Office Depot will.

Page 80

1      THE COURT REPORTER:  Anybody want a copy?
2      MR. FURR:  Oh, I'll take a copy.
3      THE COURT REPORTER:  Okay.
4      MR. SANZARO:  This is Lou.  Can Nexteligent
5  get a copy as well?
6      THE COURT REPORTER:  Okay.  Lou, let me see.
7  I have -- I need your contact information.  Sorry.
8      MR. SANZARO:  My e-mail?
9      THE COURT REPORTER:  Yes.
10     (Discussion held off the record.)
11     (Thereupon, at 4:00 p.m., the Rule 2004
12  deposition was adjourned to reconvene sine die.)
13     - - - - -
14
15
16
17
18
19
20
21
22
23
24
25



STUART ROY MILLER Volume I
IN RE: STUART ROY MILLER

January 29, 2021
81–84

**Page 81**

```
1        C E R T I F I C A T E
2    THE STATE OF FLORIDA  )
                           )
3    COUNTY OF BROWARD     )
4         I, Dona J. Wong, Registered Professional
     Reporter, do hereby certify that I was authorized to and
5    did stenographically report said Rule 2004 deposition,
     Volume I, in stenotype, and that the foregoing Rule 2004
6    deposition, Volume I, as hereinabove shown is a true and
     correct computer transcription under my shorthand notes
7    of said Rule 2004 deposition, Volume I.
8         I further certify that I am not a relative,
     employee, attorney or counsel of any of the parties, nor
9    am I a relative or employee of any attorney or counsel
     or party connected with the action, nor am I financially
10   interested in the action.
11        The foregoing certification of this transcript
     does not apply to any reproduction of the same by any
12   means unless under the direct control and/or direction
     of the certifying reporter.
13
          Dated this 8th day of February, 2021.
14
15
16        Dona J. Wong, RPR, CSR
          My Commission #GG91873
17        Expires May 16, 2021
18
19
20
21
22
23
24
25
```

**Page 82**

```
1        C E R T I F I C A T E
2    THE STATE OF FLORIDA  )
                           )
3    COUNTY OF BROWARD     )
4         I, the undersigned authority, certify that
5    STUART ROY MILLER personally appeared before me and was
6    duly sworn on the 29th day of January 2021.
7         WITNESS my hand and official seal this 8th day
8    of February, 2021.
9
10        Dona J. Wong, RPR, CSR
          Notary Public - State of Florida
11        My Commission #GG91873
          Expires May 16, 2021
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 83**

```
1    Reference No.: 6498924
2
3    Case:  IN RE: STUART ROY MILLER
4
        DECLARATION UNDER PENALTY OF PERJURY
5
        I declare under penalty of perjury that
6    I have read the entire transcript of my Depo-
     sition taken in the captioned matter or the
7    same has been read to me, and the same is
     true and accurate, save and except for
8    changes and/or corrections, if any, as indi-
     cated by me on the DEPOSITION ERRATA SHEET
9    hereof, with the understanding that I offer
     these changes as if still under oath.
10
11        _____
12        Stuart Roy Miller
13
14        NOTARIZATION OF CHANGES
15             (If Required)
16
17   Subscribed and sworn to on the _____ day of
18
19   _____, 20____ before me,
20
21   (Notary Sign)_____
22
23   (Print Name)                Notary Public,
24
25   in and for the State of _____
```

**Page 84**

```
1    Reference No.: 6498924
     Case:  IN RE: STUART ROY MILLER
2
3    Page No._____Line No._____Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____Line No._____Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   _____
23   Reason for change:_____
24
     SIGNATURE:_____DATE:_____
25   Stuart Roy Miller
```

Page 85

```
 1   Reference No.: 6498924

     Case:  IN RE: STUART ROY MILLER

 2

 3   Page No._____Line No._____Change to:_____

 4   _____

 5   Reason for change:_____

 6   Page No._____Line No._____Change to:_____

 7   _____

 8   Reason for change:_____

 9   Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24

     SIGNATURE:_____DATE:_____

25   Stuart Roy Miller
```

